ESTATE OF HENRY E. MILLS, DECEASED, EDNA DODD MILLS, EXECUTRIX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

EDNA D. MILLS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 1136, 1401. Promulgated February 26, 1945.

*Benjamin E. Shove, Esq.*, for the petitioners.
*Clay C. Holmes, Esq.*, for the respondent.

### OPINION.

MURDOCK, *Judge*: The Commissioner determined deficiencies in income tax as follows:

| Name | Docket No. | Year | Deficiency |
|------|-----------|------|-----------|
| Henry E. Mills | 1136 | 1939 | $2,868.31 |
|  |  | 1940 | 2,961.62 |
| Edna D. Mills | 1401 | 1939 | 36.98 |
|  |  | 1940 | 50.57 |

Henry Mills died after the petition was filed and his estate has been substituted as petitioner.

One issue for decision is whether the Commissioner erred in taxing distributions received by the petitioners in both taxable years from C. E. Mills Oil Co. as short term capital gains under section 115 (c) of the Internal Revenue Code, instead of as long term capital gains from distributions in "complete liquidation" under that provision. The only other issue is whether the Commissioner erred in holding that the entire amount received by Henry E. Mills in 1940 as his distribution from C. E. Mills Oil Co. was taxable to him without deducting therefrom $5,672.97 which Mills paid in a later year in discharge of the income tax liability of C. E. Mills Oil Co. The facts were presented by a written stipulation and the stipulation is adopted as our findings of fact.

Henry E. Mills and Edna D. Mills were husband and wife. They filed separate returns for the taxable years with the collector of internal revenue for the twenty-first district of New York. They were both stockholders of C. E. Mills Oil Co. (hereinafter called Mills Oil), a corporation engaged in distributing gasoline and other petroleum products at wholesale and retail in and about Syracuse, New York. It owned and operated a bulk plant, various gasoline filling stations, the necessary tank trucks, and other equipment. Its authorized capital stock was $1,000,000, consisting of 4,000 shares of preferred

stock and 6,000 shares of common stock, each share having a par value of $100; 436 shares of preferred and 3,088 shares of common were issued and outstanding. Mills was president and the principal stockholder of the corporation.

Mills Oil entered into a contract with the Pure Oil Co. on May 23, 1930. Pursuant to that contract, Mills Oil sold for $586,720 all of the property of every description with which it had been conducting its business, subject to liabilities. The property was to go to a new company to be organized by Pure Oil. The arrangement for the payment of the purchase price was, in effect, that Pure Oil was to deliver to Mills Oil Co. 5,867.20 shares of the $100 preferred stock of the new corporation, which was to be retired or repurchased within a fixed time. Three thousand of the shares were to be repurchased or retired almost immediately, and 10 percent of the remaining shares was to be retired or repurchased each year until the whole payment plan was completed.

Mills Oil and Mills agreed not to reengage in the gas and oil business without the consent of Pure Oil. Mills was to begin to work for the new corporation.

The assets of Mills Oil, shortly after May 23, 1930, consisted of an undisclosed amount of cash, of which '$174,465.81 had been received from Pure Oil in part payment of the assets sold, some accounts receivable, and 2,867.2 shares of preferred and 490 shares of common stock of Mills Petroleum Corporation. Apparently the common shares of Mills Petroleum were to be held merely as security. Pure Oil owned the remaining 510 shares of common stock of the new corporation.

All of the preferred stock of Mills Oil was retired and canceled on July 1, 1930, at the redemption price of $105 a share, plus all unpaid dividends thereon.

Mills Oil never engaged in any new enterprise after the sale of its oil and gas business. It continued to hold regular annual meetings of its stockholders and directors and to elect directors and officers.

A 45 percent dividend, amounting to $138,960, was paid on February 1, 1931.

Pure Oil purchased from Mills Oil, on June 18, 1931, 287 shares of the preferred stock of Mills Petroleum Corporation at par "plus interest." The following resolution was adopted by the directors of Mills Oil on June 29, 1931:

Resolved that a liquidating dividend of 10% on the present par value of the issued and outstanding stock be disbursed on July 1, 1931, pro rata to stockholders of record on June 30th, 1931.

$30,880 was distributed pursuant to that resolution.

The authorized capital stock of Mills Oil was reduced in July 1931 to $92,640, consisting of $3,088 shares of common stock of the par value

of $30 each, and at that time $216,600 was charged to capital account and credited to surplus.

In each of the years from 1932 to 1937, inclusive, Pure Oil purchased from Mills Oil 287 shares of the preferred stock of Mills Petroleum Corporation at par plus interest on each payment from May 23, 1930, to December 31 of the year of purchase. Mills Oil, pursuant to annual resolutions that a "cash liquidating dividend" of some amount be paid to the common stockholders, paid $30,880, or 10 percent, in 1932; $27,792, or 30 percent, on the $30 par value stock in 1933; and $27,792, or $9 a share, in 1934, 1935, 1936, 1937, and 1938. Each of these distributions was charged to the surplus account of the corporation. None of the 3,088 shares of outstanding stock was canceled or redeemed or endorsed in any way to show the above distributions.

Pure Oil, on December 30, 1938, anticipated all remaining payments under the contract of May 23, 1930, by paying to Mills Oil the full balance due, with interest; that is, it paid $129,987, of which $44,187 was on account of interest, and acquired all of the remaining stock of Mills Petroleum Corporation then owned by Mills Oil. Immediately after receiving this payment the assets of Mills Oil consisted of cash in the amount of $128,697.54 and several small accounts receivable which had no value and were charged off either at that time or at the end of the next calendar year.

Mills reported at a meeting of the board of directors of Mills Oil on December 31, 1938, that "it was desirable that the corporation should completely liquidate and be dissolved" in view of the final payment by Pure Oil Co. Thereupon it was resolved that the corporation dissolve and completely liquidate, and further that:

* * * pursuant to a plan for complete liquidation of the corporation there be and there are hereby declared the following liquidating dividends to be in complete cancellation and redemption of all the outstanding stock of this corporation, to-wit; the first of said liquidating dividends or distributions to be at the rate of $15.00 per share and to be paid December 31, 1938, to stockholders of record on December 31, 1938; and that the balance of the assets of the corporation be distributed in liquidation as follows:

25% of such balance on June 15, 1939; 25% on December 15, 1939 and the full balance on January 2, 1940.

The distributions authorized in the above resolution were paid on the dates specified. Henry E. Mills and Edna D. Mills received distributions as follows, representing their share of these liquidating dividends:

| Date | Henry E. Mills | Edna D. Mills |
|---|---|---|
| Dec. 31, 1938 | $40,117.50 | $2,250.00 |
| June 15, 1939 | 13,372.50 | 750.00 |
| Dec. 15, 1939 | 13,372.50 | 750.00 |
| Jan. 2, 1940 | 25,322.35 | 1,420.21 |

These distributions effected a complete distribution of all of the remaining assets of the corporation. All of its outstanding stock was surrendered and canceled at some undisclosed date after December 31, 1938. The corporation was dissolved on July 12, 1939.

Beginning in 1931 Mills Oil paid no capital stock tax, but filed affidavits with some of its capital stock tax returns during those years in which it stated that it was not operating but was in liquidation. The officers and directors of Mills Oil were advised by their legal counsel that the corporation should not be dissolved because to do so might jeopardize its rights and remedies under the contract of May 23, 1930.

Section 115 (c) of the Internal Revenue Code, entitled "Distributions in Liquidation," provides in part as follows:

Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117, the gain so recognized shall be considered as a short-term capital gain, except in the case of amounts distributed in complete liquidation. For the purpose of the preceding sentence, "complete liquidation" includes any one of a series of distributions made by a corporation in complete cancellation or redemption of all of its stock in accordance with a bona fide plan of liquidation and under which the transfer of the property under the liquidation is to be completed within a time specified in the plan, not exceeding, from the close of the taxable year during which is made the first of the series of distributions under the plan, (1) three years, if the first of such series of distributions is made in a taxable year beginning after December 31, 1937, or (2) two years, if the first of such series of distributions was made in a taxable year beginning before January 1, 1938.

If the distributions here in question were in "complete liquidation" within the meaning of those words as defined in section 115 (c), then the petitioners are entitled to report their gains as long term capital gains and the Commissioner erred. The legislative history of this provision is not particularly helpful. Section 115 (c) of the Revenue Act of 1932 provided that liquidating distributions should be treated as payments in exchange for the stock and taxed accordingly. This meant that they could be capital gains, and only a percentage included in taxable income. This was changed in the 1934 Act so that the entire gain recognized should be taken into account in computing net income. The committee reports show that this was done to prevent avoidance of surtax on corporate earnings through liquidating dividends. Congress, when it came to write the Revenue Act of 1936, felt that the taxation of 100 percent of such gains was preventing the liquidation of many corporations and, consequently, limiting the tax collections, so it decided to relax in the case of what it defined as distributions in

"complete liquidation." The rule was relaxed a little further in 1938 by extending the period for complete liquidations another year in certain instances for the stated purpose of encouraging the liquidation of personal holding companies, but the provision was made applicable to all domestic corporations.

The petitioners contend that a plan of liquidation was decided upon and adopted for the first time on December 31, 1938, occasioned by completion of the payments to be made under the contract of sale. This is contrary to the determination of the Commissioner and raises a question of fact (*W. F. Kennemer*, 35 B. T. A. 415; affd., 96 Fed. (2d) 177), upon which the petitioners have the burden of proof. The directors'[1] resolution of December 31, 1938, provides for the complete liquidation and dissolution of the corporation by a series of distributions which were to be made well within a two-year period. But does the evidence show that this was a new and integral plan such as is contemplated by the statute? The petitioners would eliminate from this plan and from the series of distributions in complete liquidation, all of those distributions which took place prior to December 31, 1938. If those prior distributions are to be considered a part of the plan along with the last four distributions, then, of course, the series extends far beyond the three-year limitation of the statute and the Commissioner was right in taxing the recognized gains from the distributions in the taxable years as short term capital gains.

Not only does the evidence fail to support adequately the petitioners' contention that there was a wholly new plan of liquidation adopted for the first time on December 31, 1938, but, on the contrary, it indicates rather clearly that this was no more than the necessary concluding part of a plan of dissolution formulated much earlier, under which plan the larger portion of the properties of the corporation had already been distributed in liquidation. It effected a slight acceleration of the termination of the plan of liquidation under which the corporation had been operating since the sale in 1930. But that would not make it a new plan, complete in itself and sufficient for the purpose of the statute.

Mills Oil Co. sold all of its business and business assets in 1930 and never thereafter engaged in that business or any other. It began immediately to distribute to its stockholders the proceeds from the sale as they were received. It closed out its remaining accounts, and as fast as it obtained any funds it distributed them to its stockholders. It was known from the beginning that the purchase price from the sale of the business would be realized during a limited number of years. The corporation retired its preferred stock in 1930 and in that

---

[1] The record does not disclose that the stockholders, as such, ever took any action towards liquidation and dissolution.

year began a series of distributions under which its remaining property, consisting principally of the proceeds of the sale, was distributed to the common stockholders promptly as realized.[2] The resolutions authorizing these distributions describe them as liquidating distributions and the corporation indicated in other ways that it was in the process of liquidation and dissolution. It seems pretty obvious that, following the sale, a plan was formulated under which these distributions would be made. Apparently, a part of that plan was that when all of the payments had been received the corporation would not engage further in business, but would dissolve. No specific action on the subject of dissolution was taken until 1938, but that is not to say that, until the resolution of December 31, 1938, the corporation had no plan of liquidation or that the liquidating distributions prior to that date were not of a series in complete cancellation or redemption of all of the stock in accordance with a bona fide plan of liquidation under which the transfer of the property under the liquidation was fully contemplated. To say the least, the evidence does not negative the existence of a prior plan of which the December 31, 1938, resolution was but a concluding part. The plan was carried out much as it must have been originally envisioned in 1930. The only change was that Pure Oil hastened the last few payments and the corporation was able to dissolve without endangering its rights under the contract a little sooner than could have been definitely forseen in 1930. All of the distributions from 1930 on were a part of the plan of liquidation transferring the property to the stockholders, canceling the stock, and dissolving the corporation. The plan extended over too many years to come within the exception, and whatever gain is recognized in the distributions must be considered as short term capital gain.

The petitioner contends that, even though the distributions prior to December 31, 1938, may have been liquidating distributions, nevertheless it adopted a plan on the latter date which brings the subsequent distributions within the definition of distributions in complete liquidation as used in section 115 (c). We do not think that Congress intended any such result. Mills Oil began to make liquidating distributions in 1930. These distributions actually were spread through 11 years, with resulting tax benefits to the stockholders as compared to what the tax would have been if the distributions had been concentrated in a shorter period. Congress did not intend to relax the general provisions of section 115 (c) in such cases. Its purpose was to encourage corporations which wanted to liquidate to do so at once and within a short period. The exception to the general rule which it provided does not cover a situation like the present one, where a liquidation already in progress was merely accelerated a little.

---

[2] These facts are quite different from the facts in the cases of *Sarah B. McLean Trust*, 44 B. T. A. 820, and *Charles N. Manning*, 3 T. C. 853, cited by the petitioners.

The second question for consideration is whether the distribution received by Henry E. Mills in 1940 should be decreased because Mills in 1942 paid, as transferee, a deficiency in income tax of the Mills Oil ˙for 1938. The petitioner makes the contention for such decrease, or at least in the amount of the deficiency in tax paid, namely, $4,784.69. The contention is that Mills received his distribution subject to a liability to pay any deficiency in income tax which might be found to be due from Mills Oil.

Additional income taxes of Mills Oil for the years 1936, 1937, and 1938 were assessed and paid in 1939. The Commissioner in 1940, after another audit, concluded that additional income taxes for 1938 in the amount of $7,553.70 were due from Mills Oil. Henry E. Mills first heard about this in November 1940. A deficiency notice was mailed to the corporation on June 5, 1941. A petition in respect thereto was filed by the corporation with the Board of Tax Appeals. A notice of transferee liability for this tax was mailed to Henry E. Mills on July 25, 1941. The tax liability and proceedings before the Board were settled by stipulation of the parties and a payment on April 17, 1942, by Mills of $4,784.69 plus interest thereon of $888.28, making a total of $5,672.97.

The respondent contends that no decrease in the amount of the liquidating distribution received in 1940 should be made because of the payment of the deficiency in tax and interest made by Mills in 1942. It was held in *Schramm* v. *United States* (Ct. Cls.), 36 Fed. Supp. 1021, that, where a liquidating dividend distributed to a stockholder in 1929 was received by him without restriction upon its disposition and was acquired under a claim of right and without knowledge of any infirmity of title, and that situation existed at the close of 1929, the amount of the profit in the dividend constituted taxable income for that year, and the fact that the stockholder during 1931 was obliged to restore to the corporation a portion of the amount received by him in 1929 to satisfy in part an additional assessment by the Commissioner for 1928 did not alter the amount of the stockholder's gross income for 1929. The Court of Claims relied upon *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, in which it was held that:

* * * If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * *

The respondent also cites *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516, and *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281. In the last named case the Supreme Court referred to its opinion in *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359, 365, and stated:

The rationale of the system is this: "It is the essence of any system of taxation

that it should produce revenue ascertainable, and payable to the government, at regular intervals. Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation."

This legal principle has often been stated and applied [citing cases]. The uniform result has been denial both to government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, applying the accrual basis, the year in which the right to receive, or the obligation to pay, has become final and definite in amount.

In the instant proceedings it is stipulated that it was not until after Mills had received his distribution from the C. E. Mills Oil Co. on January 2, 1940, that any claim was made by the respondent that there was a deficiency in income tax due from the C. E. Mills Oil Co. for 1938. Clearly Mills received his distribution in 1940 under a claim of right which had never been challenged. The distribution received by Henry E. Mills on January 2, 1940, is not subject to any reduction because of his payment in 1942 of the deficiency in income tax of the Mills Oil Co. for 1938.

Reviewed by the Court.

*Decisions will be entered for respondent.*

---

SMITH, J., dissenting: The distributions made by C. E. Mills Oil Co. to its stockholders in years prior to 1938 were not "liquidating dividends" because they were not in redemption of shares of stock of the company. They were ordinary dividends and the stockholders receiving them were taxable upon net earnings of the corporation included in such distributions. The fact that the distributions were in excess of the earnings available for distribution did not make them liquidating dividends.

It was not until the company received final payment under the contract of May 23, 1930, from the Pure Oil Co. that a plan was formulated for the liquidation of the corporation. It seems to me that the formulation of that plan was not affected by anything that went before.

Section 115 (c) of the Internal Revenue Code was intended to place stockholders receiving distributions in complete liquidation in the same position as stockholders who sold their shares of stock. It can not be doubted that if in 1938, 1939, or 1940 the petitioners had sold or exchanged their shares of stock for amounts substantially equivalent to the amounts of distributions which would be made by the Mills Oil Co., the gains resulting from such sales or exchanges would have been long term capital gains and that the petitioners would be taxable upon only 50 percent of such gains. The petitioners claim the same rights which they would have if they had sold their stock. I think that the claim is valid.

ARUNDELL, J., agrees with this dissent.