ESTATE OF ESTHER M. STEIN, DECEASED, SAMUEL STEIN, EXECUTOR AND SAMUEL STEIN, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 47465, 47466, 47467, 47475.    Filed January 31, 1956.

---

[1] The following proceedings are consolidated herewith: Estate of Esther M. Stein, Deceased, Samuel Stein, Executor, Docket No. 47466; National Thread Company, Incorporated, Docket No. 47467; and Samuel Stein, Docket No. 47475.

Joseph Getz, C. P. A., and Murray L. Brinn, Esq., for the petitioners.

William G. O'Neill, Esq., and Maurice E. Stark, Esq., for the respondent.

OPINION.

BLACK, *Judge:*

*Issues 1, 2, and 3.*

We first consider to what extent and to whom certain stipulated unreported sales and certain alleged "unexplained" or "unidentified" bank deposits represent unreported taxable income.

1. The parties stipulated that during the years 1942 through 1945, sales totaling $156,203.63 were made in the names of Samuel, Carolina, and NTC (as fully detailed in our Findings of Fact), that the proceeds thereof were received by Samuel and/or Esther, and that such sales were not reported for tax purposes by any of the petitioners herein. Petitioners contend that those sales are reportable only by Samuel on the grounds that (a) the sales in Samuel's name were just what they purported to be, (b) the sales in Carolina's name were Samuel's because Carolina was a trade name registered by Samuel and under which he conducted business operations, and (c) the sales in NTC's name were erroneously billed by NTC and were actually Samuel's. Respondent maintains that all the sales were NTC's and are taxable first to NTC and then, as corporate distributions, to Samuel and Esther.

Whether the stipulated unreported sales were, in the first instance, Samuel's or NTC's is a question of fact. *Miller-Smith Hosiery Mills*, 22 T. C. 581. We have carefully studied the extensive and complex record before us and have concluded that they were NTC's sales.

Those sales were made to purchasers who ordered, as they usually did, from NTC's offices without indicating in any way that they wished to buy from Samuel as an individual, or from Carolina, rather than from the corporation. Samuel merely made the unilateral decision that certain of the sales were to be billed in his name or in Carolina's name. Samuel exerted no efforts to make those sales and performed no services in relation thereto which in any particular differed from his routine duties as president of NTC.

Further, the sales were in fact made from stock which was purchased by and belonged to NTC. Such stock was located in NTC's stockroom and no attempt was made to segregate any of it into lots purporting to belong to Samuel or Carolina, as distinguished from NTC. Although petitioners contend that Samuel replaced the NTC merchandise used to make the disputed sales with merchandise he purchased for cash, the record contains no convincing evidence indicating that he made any such cash purchases with funds belonging solely to him. See *Jack M. Chesbro*, 21 T. C. 123, affd. (C. A. 2) 225 F. 2d 674.

In their brief petitioners concede that Carolina's operations in 1942 were conducted on behalf of NTC and, consequently, that the stipu-

lated unreported sales for 1942 (all of which were made in Carolina's name) were taxable to NTC. They contend, however, that Carolina was originally Samuel's business; that in 1935, he agreed Carolina would be conducted in NTC's behalf in return for a promise that he get a share in NTC's business; that in 1943, he rescinded this arrangement when he was not given the share in NTC which he desired; and that thereafter Carolina was conducted in Samuel's individual behalf and the sales in its name were Samuel's. We are unable to credit this explanation. We have found that, from its inception in 1923, Carolina was NTC's creature. It was originally established to perform "converting" operations for NTC and was located in Hoboken, New Jersey. Although the Carolina trade name was registered by Samuel and Samuel supervised its operations, Carolina was entirely underwritten by NTC, which each week gave Samuel the cash to meet Carolina's payroll, gave him cash to pay Carolina's rent, and also gave him cash for his own use.

In 1935, Carolina's operation was moved to NTC's place of business because Samuel found it too difficult to commute to Hoboken. Petitioners contend that, contemporaneously with the move, Carolina was transferred from Samuel to NTC in return for which Esther promised to give Samuel a stock ownership share in NTC. Petitioners would then have us believe that 8 years later, in 1943, Samuel realized that he would not get the share in NTC promised him in 1935, so he rescinded the Carolina transfer and thereafter ran Carolina for his own benefit.

Even were we to believe that prior to 1935, Carolina was Samuel's individual operation (which, as noted above, we do not), we would be unable to agree that there was a rescission in 1943 of the alleged 1935 transfer thereof to NTC. There is no extrinsic evidence of any actual separation between Carolina and NTC in 1943. Indeed, all operations appear to have been conducted without change, and the proceeds of Carolina's unreported sales in 1943 were actually deposited in Samuel's and Esther's joint bank accounts.

Considering the record as a whole, and in particular the matters discussed above, we conclude that in substance the stipulated unreported sales were sales of NTC and are taxable to it. See *Miller-Smith Hosiery Mills, supra.* The fact that some of the sales proceeds did not pass through the corporation's hands does not affect this conclusion. *Essex Construction Co.,* 12 T. C. 1212.

2. Respondent determined in his deficiency notice that $83,637.39 in "unexplained" or "unidentified" bank deposits made to the individual and joint accounts of Samuel and Esther constituted additional taxable income to petitioners. After further study respondent stipulated that $24,773.82 thereof was not taxable to any petitioners.

Respondent also stipulated that $11,195.64 of the remaining $58,863.57 was not taxable to NTC, but still alleges that such deposits are taxable to Samuel and/or Esther. He also alleges that the $47,667.93 balance of that $58,863.57 represents unreported proceeds of sales by NTC which are taxable first to NTC and then, as corporate distributions, to Samuel and/or Esther.

Our Findings of Fact detail the sources of the $11,195.64 which respondent maintains is taxable to Samuel and/or Esther. The major part of it, $6,850, represents rent received by Esther in 1943 and by Samuel in 1945 for the leasing of a resort hotel and resort roominghouse owned by Esther in upper New York State. Although Esther and Samuel failed to include those rents in gross income, respondent concedes that unreported deductible expenses were incurred in connection with, and were at least equal to, those rents and consequently that petitioners are not taxable for any additional net income.

Also included in the $11,195.64 were checks, totaling $2,132.22, drawn by others on banks located in the same general upstate New York area as Esther's aforementioned resort hotel and roominghouse, which checks were deposited by Esther. Esther herself operated those two properties in 1942, in which year $1,882.43 of the aforementioned checks were received. The 1942 checks, 6 in number, were all for sums of $50 or more and, with one exception, were for even dollar amounts. These factors (i. e., Esther's operation of the hotel and roominghouse and the banks on which, and sums for which, the checks were drawn), coupled with the fact that petitioners gave no convincing explanation of the source of those deposits, lead us to conclude that they represent payments received by Esther from guests of the hotel and roominghouse and, as such, are taxable to her in 1942.

On the other hand, such factors are not present as regards the $249.79 in checks received by Esther in 1943. The two resort properties were operated in that year by others to whom she had leased them and the checks composing the $249.79, five in number, were in general for small, odd amounts. We think some of those checks were merely cashed by Esther as an accommodation, then deposited by her, and that the others likewise represent items of a non-income nature. The $249.79, therefore, does not represent taxable income to Esther or Samuel in 1943. However, petitioners do concede that in 1943 Esther failed to report and is taxable on $604.10 in bond interest.

The final items included in the $11,195.64 are $1,409.32 received in bond interest by Samuel in 1944 and 1945, and $200 received by him from one Max Broder in 1945. The latter we have found to be a loan repayment, nontaxable to Samuel. As for the former, Samuel actually reported more interest income in 1944 and 1945 than the amount of the bond interest received in each of those years. The excess interest income so reported totaled $1,863.93.

We next consider the $47,667.93 balance of the alleged "unexplained" or "unidentified" bank deposits. We have found that $1,863.93 of those deposits represented interest income to Samuel in 1944 and 1945 which, as noted in the preceding paragraph, he reported in those years. On the other hand, $337.50 thereof represents the excess of mortgage interest received by Esther in 1942 over interest income reported in her joint return filed with Samuel for that year and is consequently taxable solely to her. After reducing the $47,-667.93 by those two sums we are left with a total of $45,466.50 in deposits the nature of which must be determined.

Petitioners contend that none of those deposits are of unreported taxable funds. We have carefully examined the testimony and exhibits, taken note of the amounts and frequency of the deposits involved and of their relation to the cash Samuel and Esther probably had on hand from either nontaxable sources or taxable and reported sources, and have considered the effect of respondent's concessions regarding the nontaxability of some of the deposits originally determined to represent unreported income. The testimony of petitioners' witnesses, as it bore on the matter, was general and unconvincing and their attempt to identify the deposits as stemming from nontaxable sources was not buttressed by the available documentary evidence. Our analysis, therefore, compels us to conclude that petitioners' contention cannot be sustained in its entirety.

However, we feel that some portion of the deposits does not represent additional taxable income to petitioners but, rather, was savings of Samuel and Esther from their NTC salaries, loans and exchange items from NTC, and the like. Exercising our best judgment, but bearing heavily against petitioners, *Cohan* v. *Commissioner*, (C. A. 2) 39 F. 2d 540, we have concluded that 50 per cent of the $45,466.50 (or $22,733.25) was from such sources and therefore is not taxable income to any of the petitioners.

On the other hand, we hold, after a consideration of the whole record, that the remaining $22,733.25 of deposits constitutes the proceeds of unreported sales by NTC.

Petitioners argue that Samuel and Esther lived frugally and accumulated a great deal of money prior to the years in issue from which the disputed deposits were made. Even assuming the thriftiness of Samuel and Esther, however, there is no convincing evidence in the record indicating a cash accumulation of funds necessary to make deposits of the magnitude in question in addition to those deposits conceded by respondent, and those heretofore found by us, not to represent additional taxable income.

We therefore conclude that the $22,733.25 in disputed deposits made during the years in issue was derived from a current source or

sources of income and that the only possible source thereof was NTC. Consequently, those deposits represent unreported sales of NTC.

3. We next consider to what extent NTC's unreported sales proceeds totaling $178,936.88 ($156,203.63 stipulated, plus $22,733.25 reflected in the "unexplained" or "unidentified" bank deposits) should be offset, in determining its net income for each year in issue, by unreported purchases. Respondent contends that NTC made no purchases which were not in fact already deducted in reporting its net income. Petitioners argue, however, that additional unreported purchases were made and must be taken into account in arriving at NTC's unreported net income (which, for present purposes, equals NTC's unreported gross profit).

Despite the lack of specific evidence, we think that some purchases were made which were not reflected in NTC's returns. There is no way to accurately determine the amounts thereof so, again resorting to the *Cohan* principle, we have concluded that such unreported purchases total 25 per cent of the $178,936.88 in total unreported sales. Consequently, the aggregate unreported gross profit and net income for 1942–1945 resulting from those sales equal $134,202.65. (These figures are broken down in our findings to reflect the amount allocable to each year in issue.)

Our determination that, in computing NTC's additional net income, allowance must be made for unreported purchases has no bearing upon calculation of the amount of corporate distributions to Samuel or Esther. The entire $178,936.88 in NTC's unreported sales proceeds was either deposited in Samuel's and Esther's bank accounts, taken by them in cash, or entered to their credit on NTC's books and it is that amount which we regard as corporate distributions. See, e. g., *E. T. Schuler*, 29 B. T. A. 415. Whether, in any one year, Samuel or Esther is to be regarded as the recipient of those distributions, and the tax treatment to be accorded the distributions (i. e., ordinary income, capital gains, or return of capital) is hereinafter considered.

### Issues 8 and 9.

Logical presentation would seem to indicate that we now discuss to whom, i. e., Samuel or Esther, and in what years, the $178,936.88 proceeds of NTC's unreported sales constituted corporate distributions. The parties do not appear to dispute that, if we determine (as we have) that those unreported proceeds were from sales by NTC, such proceeds also represent distributions in the nature of constructive dividends (taxable as ordinary income) to Samuel or Esther to the extent of NTC's earnings and profits, and that the first $10,000 distributed in excess of earnings and profits is a nontaxable return of capital ($10,000 being the cost of NTC's stock). See *Jack M.*

*Chesbro, supra; United Mercantile Agencies, Inc.,* 23 T. C. 1105; *E. T. Schuler, supra;* sec. 115 (a), (b), and (d), 1939 Code. Issues are raised, however, regarding the computation of earnings and profits and the treatment of any distributions which are in excess of earnings and profits plus the $10,000 cost of stock. Those issues will be considered at a later point.

Whether or not Samuel or Esther was the recipient of the corporate distributions turns, the parties agree, on who was the true owner of NTC's stock. As regards 1942, this question is not of importance, since Samuel and Esther filed a joint return for that year. It is also not disputed that Samuel was the sole owner of NTC's stock during all of 1945, with the result that the distributions are taxable entirely to him in that year.

Respondent contends that Samuel and Esther each owned 50 per cent of NTC's stock until March 27, 1944, the date of Esther's death, whereupon Samuel became the owner of all the stock. Petitioners' position is that Esther owned all the stock until January 27, 1944, on which date she transferred it to Samuel making him the sole owner thereof. We agree with petitioners.

Since 1916, Esther had been the record owner of all of NTC's stock, at least half of which she got from her father. Although Samuel signed her stock certificates as NTC's president, he was then president in name only, with no actual control whatever over NTC's operations or policies. Esther ran the business and made all policy decisions for many years. It is true that Samuel gradually took an increasingly larger part in the business and that from about 1942 on he was the more dominant of the two in directing NTC's affairs. However, Esther by no means abdicated all authority. She continued to remain active until she became ill just prior to her gratuitous transfer of the NTC stock to Samuel on January 27, 1944—which transfer was formally made with the aid of an attorney and prior to which Samuel never had any of NTC's stock in his name. In this context the fact alone that Samuel was the dominant manager of NTC during the years in issue does not also mean that he was a part owner thereof. Cf. *Willis H. Vance,* 14 T. C. 1168.

All things considered, therefore, we conclude that Esther was the true owner of all NTC stock until January 27, 1944, and that, from and after that date, Samuel was the sole owner thereof. Consequently, Esther was the recipient of all the corporate distributions in issue made prior to January 27, 1944, and Samuel was the recipient of the distributions made on and after that date.

A table in our findings shows that $4,921.74, $3,364.84, and $3,285.84 of the proceeds of the stipulated unreported sales made in 1943, 1944, and 1945, respectively, were not received in each case until the year

following the sales giving rise thereto. Those proceeds are properly includible in NTC's income for the year of sale, rather than the year of receipt, since NTC kept its books and filed its returns pursuant to the accrual method of accounting. However, they are includible in determining Esther's or Samuel's income (depending upon whether they were received before or after January 27, 1944, as set out in our findings) in the year of receipt, Esther and Samuel being on the cash basis. Regs. 111, sec. 29.41-2. Appropriate adjustment will be made in the Rule 50 computation.

### Issues 4 and 11.

For each year in issue NTC deducted on its return certain sums for "traveling and selling expenses," and respondent disallowed a portion of those deductions. (Our findings contain the pertinent figures.) The amounts disallowed were in general represented by checks drawn either to the order of Samuel or to "cash" and not substantiated by any further records. We are convinced that some of those checks were actually reimbursements to Samuel and NTC's salesmen for traveling and selling expenses incurred by them and, as such, represent ordinary and necessary expenses deductible under section 23(a) (1)(A) of the 1939 Code. Since, however, we are unable to determine from the record which of those checks do represent such expenditures, we have resorted to the *Cohan* principle and concluded that NTC may deduct, in each taxable year, $1,000 more for traveling and selling expenses than the amount allowed therefor by respondent.

As noted in our findings the returns filed for the years in issue by Samuel, Esther, and the estate (for Esther) claimed various deductions for unreimbursed "traveling," "entertainment," and "necessary" expenses allegedly incurred on NTC's behalf, which deductions respondent disallowed. Petitioners presented no proof that those claimed expenditures were actually incurred (let alone that they were ordinary and necessary). We therefore conclude that respondent's disallowances were not in error.

### Issues 5, 7, 12, and 13.

It is the contention of petitioners that assessment of deficiencies against all of the petitioners herein for 1942 is barred by the statute of limitations, section 275(a) of the 1939 Code, and that assessment is also barred for the year 1943, except to the limited extent permitted by section 275(c) of the 1939 Code. It is clear that the bar of the statute of limitations does exist in favor of all the petitioners for 1942 unless respondent has proved by clear and convincing evidence that their returns for 1942 were false or fraudulent with intent to evade

the tax. After an examination and consideration of all the evidence, we have made a finding as to each of petitioners that their returns for that year were not false or fraudulent with intent to evade tax. It is true that there were some omissions of income from the returns, as has been pointed out in our Findings of Fact, but these omissions for 1942 were comparatively small in amount and we are not convinced that they were falsely or fraudulently omitted from the returns. We therefore hold in petitioners' favor on the issue of the statute of limitations for the year 1942.

We do not hold in petitioners' favor for the year 1943, except as to Samuel. The amounts omitted in 1943, except as to Samuel, were too large to admit of our believing that they were innocently made. We have therefore found that the returns of NTC and the Estate of Esther for 1943 were false and fraudulent with intent to evade tax. Only small omissions were made from Samuel's return for 1943, when it is considered that we have held that the unreported sales were sales of NTC and not sales of Samuel, and that the constructive dividends resulting therefrom in 1943 were the dividends of Esther, because she was the sole owner of NTC's stock in 1943. We have therefore made a finding of fact that Samuel's return for 1943 was not false or fraudulent with intent to evade tax.

It follows from what we have just said above that for the year 1943 the bar of the statute of limitations provided in section 275 (a) has not run in favor of NTC or the Estate of Esther. Sec. 276 (a), 1939 Code. It has run in favor of Samuel. Petitioners do not contend that the statute of limitations bars assessment for the years 1944 and 1945.

We next consider as to those years where the statute of limitations has not barred assessment of the deficiencies, whether the deficiencies determined against the petitioners are due in whole or in part to fraud with intent to evade tax. Sec. 293 (b), 1939 Code.

In a civil action respondent must prove fraud by clear and convincing evidence; that is, he must prove that the petitioner intentionally evaded a tax believed to be owing. Sec. 1112, 1939 Code; *Wiseley* v. *Commissioner*, (C. A. 6) 185 F. 2d 263. The question of fraud is one of fact and must be decided on the basis of all the conditions and circumstances surrounding the transaction. *Wallace H. Petit*, 10 T. C. 1253; *William W. Kellett*, 5 T. C. 608; *M. Rea Gano*, 19 B. T. A. 518.

Samuel was NTC's president and, from about 1942 on, the dominant figure in both operating and policy planning for NTC. In 1942 and 1943, Esther, who then owned all of NTC's stock, was still active in the business but after January 27, 1944, on which date she transferred all her stock to Samuel, Samuel in effect took over all the reins of NTC. Although Samuel immigrated to this country when he was

15 and had little formal education, we think he had a great deal of business intelligence and was a successful businessman. During the years in issue he was in his middle sixties. He was then afflicted with cataracts but was able to and did read with the aid of a magnifying glass. We cannot, in brief, agree with petitioners that understatements of income, of the magnitude herein found from 1943 on, were the result of Samuel's ignorance, oversight, or lack of comprehension.

The evidence of intentional wrongdoing is by no means meager. First we note that (a) NTC's actual net income for 1943, 1944, and 1945 exceeded by well over 100 per cent the net income reported in its return for those respective years, and (b) Esther's actual net income for 1943 and Samuel's actual net income for 1944 and 1945 exceeded the net income reported in their respective individual returns for the applicable year by far more than 100 per cent. Such discrepancies over a period of successive years strongly evidences an intent to defraud. *Rogers* v. *Commissioner*, (C. A. 6) 111 F. 2d 987.

Second, as regards the $156,203.63 in stipulated unreported sales made in the names of Samuel, Carolina, and NTC, it was Samuel who determined in the first instance the name in which such sales would be billed. Moreover, when the proceeds of some of those unreported sales which were made in NTC's name were found by Samuel to have been deposited in NTC's bank account, he had those sums credited to him in the corporation's "Loans and Exchanges" account. On a few occasions Samuel also ordered sales originally entered on NTC's books to be offset by credit memos, implying returned merchandise, when the purchasers had not in fact returned the merchandise. *Spies* v. *United States*, 317 U. S. 492.

Third, the proceeds of some sales made by NTC were deposited directly in Samuel's and Esther's bank accounts, without being recorded in any books or records. See *Spies* v. *United States*, *supra*.

All the petitioners' returns herein were prepared by an accountant but it was the accountant's practice to discuss with Samuel the affairs of NTC and of Samuel and Esther prior to making out their returns. Petitioners attempt to show that the accountant was given or took complete records of all NTC's transactions and that any understatements were solely the accountant's fault and were unnoticed by Samuel. The evidence does not support that explanation. Certainly Samuel, who directed NTC's operations, could not fail to note the omission of such large sums of income from NTC's returns or his own individual returns, unless he completely ignored the returns he was signing. This last is what petitioners wish us to believe, but Samuel's business sense, plus the accountant's practice of discussing his clients' affairs before preparing their returns, belie such a conclusion.

The circumstances set forth above clearly evince a pattern of willful failure to report income. They leave us in no doubt that first, as regards NTC, the deficiencies in its returns for 1943 through 1945 were due, at least in part, to fraud, which is imputed to NTC through Samuel, its president and dominant administrative officer, who was the chief perpetrator of the unlawful conduct. *George M. Still, Inc.*, 19 T. C. 1072, affd. (C. A. 2) 218 F. 2d 639.

By the same token the deficiencies in Samuel's individual returns for 1944 and 1945 were due in part to fraud. However, our determination that the proceeds from NTC's unreported sales for 1943 represented corporate distributions entirely to Esther leads to a different conclusion anent Samuel's 1943 return. The understatement of income in that return was minor in nature (resulting from excess deductions for traveling, etc., expenses), and there is no proof of circumstances from which it can be concluded that such understatement was due to fraud. Consequently, as noted heretofore, the assessment of any deficiency against Samuel for 1943 is barred by the statute of limitations. Sec. 275 (a).

Esther died prior to the filing of her return for 1943. Her return for that year was, therefore, signed and filed by Samuel, her executor. Petitioners argue, without citing authority, that Esther "cannot be found to have perpetrated a fraud on a tax return not drawn or signed by her."

Under sections 142 (a) (1) and 3797 (a) (6) of the 1939 Code, Samuel, as Esther's executor, was the fiduciary who was required to file Esther's return for 1943. Section 142 (c) provides that "Any fiduciary required to make a return under this chapter shall be subject to all the provisions of law which apply to individuals." Such a "provision[s] of law" is the addition for fraud under section 293 (b). In view of the above statutory language and the nature of the addition for fraud—which is not a punishment but is remedial in nature, intending to compensate the Government for the heavy expense of investigation and the loss resulting from the fraud, *Helvering* v. *Mitchell*, 303 U. S. 391; *Estate of Charles Louis Reimer*, 12 T. C. 913, affd. (C. A. 6) 180 F. 2d 159—we see no more objection to applying the fraud addition in this case than in other instances wherein the owners of the income were not personally fraudulent. See, e. g., *George M. Still, Inc.*, *supra* (corporations) ; *Myrna S. Howell*, 10 T. C. 859, affd. (C. A. 6) 175 F. 2d 240 (joint returns). Such a conclusion, of course, may have unfortunate consequences for the deceased's successors but their remedy must lie by way of action against the fiduciary.

What we have just said relates to the legality of the imposition of additions for fraud where the return has been filed by a fiduciary. It remains only to determine whether Samuel was in fact fraudulent in filing Esther's 1943 return. Our previous discussion makes it clear

that he was. He obviously knew that the proceeds of NTC's unreported sales were received by Esther since he was instrumental in making those sales and channeling the income into both the joint bank accounts (in his and Esther's names) and Esther's individual accounts. Moreover, as aforementioned, we do not believe that he signed and filed Esther's return without paying attention to the contents thereof. We hold, therefore, that the Commissioner has sustained his burden of proving that part of the deficiency against the Estate of Esther for the year 1943 was due to fraud with intent to evade tax.

As heretofore stated we have held that the statute of limitations bars assessment against Samuel and Esther for 1942. But it should also be noted that the forgiveness feature of the Current Tax Payment Act of 1943 applies to their joint return for 1942. As regards 25 per cent of the 1942 tax which, pursuant to that forgiveness provision becomes part of a taxpayer's 1943 tax, section 6 (d) (2) of the Current Tax Payment Act makes it clear that where a *joint return* was filed by Samuel and Esther for 1942, and separate returns were filed by them for 1943, the liability for 25 per cent of their 1942 tax is "*joint and several.*" This means that even though we have found that Samuel's 1943 return was not fraudulent and therefore that the statute of limitations bars assessment of deficiencies against him for 1943, 25 per cent of the difference between the tax he and Esther reported for 1942 and their correct tax for that year is all includible as part of the 1943 deficiency of Esther (who filed a 1943 return which *was* fraudulent, thereby resulting in removal of the statutory bar as to her for 1943). See *Lawrence W. Carpenter*, 10 T. C. 64; *William W. Todd*, 10 T. C. 655; *Tressler* v. *Commissioner*, (C. A. 4) 206 F. 2d 538.

## Issue 6.

Having determined that NTC's deficiencies for 1943 through 1945 were due at least in part to fraud, we must now determine whether the 50 per cent fraud addition applicable to NTC's 1943 deficiency in excess profits tax should be calculated (a) on the total amount of such deficiency, or (b) only after first deducting from such deficiency the 10 per cent postwar refund credit allowed under section 780 (a) of the 1939 Code.

Section 780(a), as here applicable, provides for establishment of a credit to a taxpayer's account equal to 10 per cent of the excess profits taxes imposed for the 1942 and 1943 calendar years.[4] If such

---

[4] SEC. 780. POST-WAR REFUND OF EXCESS PROFITS TAX.

(a) IN GENERAL.—The Secretary of the Treasury is authorized and directed to establish a credit to the account of each taxpayer subject to the tax imposed under this subchapter, for each taxable year ending after December 31, 1941 (except in the case of a taxable year beginning in 1941 and ending before July 1, 1942), and not beginning after December 31, 1943, of an amount equal to 10 per centum of the tax imposed under this subchapter for each such taxable year. * * *

taxes, or any deficiencies therein (sec. 781(a)),[5] were paid before July 1, 1945, the 10 per cent credit was effectuated by issuance to the taxpayer of non-interest-bearing bonds (in an amount equal to the credit) which were, until the cessation of hostilities in World War II,[6] nonnegotiable and nontransferable, and were payable at the taxpayer's option on or after January 1, 1946. Sec. 780 (b), (c), and (d). If, however, the taxes, or any deficiencies therein, are paid on or after July 1, 1945, section 781(c) provides that the 10 per cent credit attributable to the particular payment shall be paid to the taxpayer in cash.[7]

Petitioners contend that the fraud additions applicable to NTC's 1943 excess profits taxes should be calculated, for such year, as 50 per cent of the sum remaining after deduction of the 10 per cent credit from the deficiency for such year. They rely on section 781 (c) and, after quoting part of that section in their brief, make their entire argument in the following single paragraph:

The effect of the above statute is to reduce the excess profits tax liability of the taxpayer where payment is made after July 1, 1945. Therefore, petitioners are of the view that it is inequitable to impose a penalty on an amount for which it is not liable and which in a practical sense it is not required to pay. Penalties, while punitive, should be fair and just. Unless the post war refund is deducted from the deficiency of excess profits tax, it would be unfair and the penalty would be based on an amount the taxpayer does not owe.

The plain words of the statute, however, give no support to petitioners' argument. Section 293 (b) provides that the addition for fraud is "50 per centum of the total amount of the deficiency." The pertinent provisions of sections 780 and 781 clearly do not contemplate that the refund credit is to be taken into account in calculating such "total amount of the deficiency," *California Vegetable Concentrates, Inc.*,

---

[5] SEC. 781. SPECIAL RULES FOR APPLICATION OF SECTION 780.

(a) EFFECT OF DEFICIENCIES.—If a deficiency in respect of the excess profits tax for any taxable year for which a credit is provided in section 780 (a) is paid by the taxpayer before July 1, 1945, an amount of such credit equal to 10 per centum of the excess of the tax imposed by this subchapter on the basis of which the deficiency was determined, over the tax imposed by this subchapter as previously computed and paid shall be available, as provided in section 780 (b), for the purchase of bonds as provided under such section, * * *

[6] December 31, 1946.

[7] SEC. 781. SPECIAL RULES FOR APPLICATION OF SECTION 780.

(c) TAX PAYMENTS AFTER CUT-OFF DATE.—In the case of a payment of the tax imposed by this subchapter shown on the return for any taxable year for which a credit is provided in section 780 (a), or the payment of a deficiency in respect of such tax for any such taxable year, on or after July 1, 1945, the amount of the credit under section 780 (a) for such taxable year attributable to such payment shall be paid the taxpayer in cash. No interest for the period after December 31, 1945, shall be assessed or collected on that portion of the tax or deficiency so paid equal to the credit under section 780 (a) attributable to such payment. If after January 1, 1946, there is any credit under section 780 (a) remaining in favor of the taxpayer attributable to any taxable year for which a credit is provided in section 780 (a), such remainder shall be paid to the taxpayer in cash. No amount of any payment made under this subsection to a taxpayer shall be included in gross income.

10 T. C. 1158,[8] and there is no hint in the Code of special treatment for a situation of this sort.[9] It follows, therefore, that the fraud addition is properly to be calculated on the basis of the total deficiency, *without* reduction for the refund credit. We sustain the Commissioner as to this issue.

### *Issues 10 (a) and (b).*

(a) In determining what portion of NTC's corporate distributions to Samuel and Esther was taxable to them as ordinary income resulting from constructive dividends, respondent reduced NTC's earnings and profits for each taxable year in issue by the deficiencies determined against the corporation for that year but made no such reductions for the fraud additions determined. Petitioners contend that a fraud addition accrues, and is deductible in determining earnings and profits, at the end of the taxable year to which it applies or, in the alternative, when the tax return for that year is filed.

Respondent's brief contains no argument on this issue. We assume, however, that respondent relies on Revenue Ruling 107, 1953–1 C. B. 178, which is reproduced in its entirety in the margin.[10] No authority is cited for the position taken in that ruling.

Respondent's action in deducting each determined deficiency from NTC's earnings and profits for the year to which the deficiency applies, even though the deficiency was contested, is required under the law. Many cases support the proposition that, in determining earnings and profits at the end of a year, an accrual basis taxpayer must deduct its Federal taxes for that year, which taxes are deemed to accrue at the end of the year when all the events have occurred which fix their amount and determine the taxpayer's liability therefor. Regs. 111, sec. 29.115–3; [11] *Commissioner* v. *South Texas Lumber Co.*, 333 U. S. 496; *United States* v. *Anderson*, 269 U. S. 422; *Fawcus Machine Co.*

---

[8] In that case we said, at pages 1171 and 1172:

* * * The credit for post-war refund of excess profits tax provided by section 780 is not a credit against tax imposed, so as to reduce tax liability. It is a credit to the account of a taxpayer for which bonds or cash may be issued, depending upon when the tax is paid. Sec. 780 and 781. *The amounts thereof, if any are allowable, form no part of the computation of a deficiency.* * * * [Emphasis added.]

[9] It is specifically provided in section 781 (c) that, after December 31, 1945, the running of interest stops on that portion of any unpaid excess profits tax or deficiency which is equal to the refund credit applicable thereto. By contrast, the omission of any special provisions relating to computation of the fraud addition indicates that Congress did not intend any result other than that dictated by the plain words of the statute.

[10] Fraud penalties recommended against a taxpayer should not be accrued as liabilities for the purpose of determining the amount of surplus and earnings available for dividends, until the liability therefor has become final and definite in amount, either by agreement or otherwise.

[11] EARNINGS OR PROFITS.—In determining the amount of earnings or profits * * * due consideration must be given to the facts, and, while mere bookkeeping entries increasing or decreasing surplus will not be conclusive, the amount of the earnings or profits in any case will be dependent upon the method of accounting properly employed in computing net income. * * *

v. *United States*, 282 U. S. 375; *Rose* v. *Dobbs*, (C. A. 5) 36 F. 2d 464; *Lane-Wells Co.*, 45 B. T. A. 175; *Lisk Manufacturing Co., Ltd.*, 11 B. T. A. 179. Any contention, based on the doctrine of *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516, and *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281, that a contested tax may not be deducted from earnings and profits until the taxpayer's liability therefor has been finally determined has, we think, already been effectively answered by us in *Stern Brothers & Co.*, 16 T. C. 295. See also *Pacific Affiliate, Inc.*, 19 T. C. 245; *Geo. W. Ultch Lumber Co.*, 21 T. C. 382.

We regard the *Stern Brothers* opinion of value not merely as interpreting a specific regulatory provision under the excess profits tax law but also as enunciating a general principle applicable alike to earnings and profits computations for income tax purposes. Here, for example, just as in *Stern Brothers*, it is important to calculate earnings and profits which "show the true financial status of an accrual basis taxpayer" in order that distributions which actually impair capital will not be taxed as dividends. To accomplish this the accrual basis taxpayer's true tax liability must be considered, whether or not such taxpayer is aware of, or agrees to, such liability.

Respondent, it has been noted, actually did reduce NTC's earnings and profits by the contested deficiencies determined against it. Apparently, therefore, he agrees with our interpretation that the *Stern Brothers* doctrine regarding contested taxes applies to earnings and profits computation for income tax purposes. Having gone this far, we fail to see any reason for respondent's not also applying the doctrine to fraud additions which a taxpayer contests but for which he is actually liable. True it is that *Stern Brothers* dealt in terms only with *taxes*, but clearly earnings and profits will only "show the true financial status of an accrual basis taxpayer" where additions to the tax (such as that for fraud) for which the taxpayer is actually liable at the time of the computation (though the taxpayer does not concede liability) are also reflected in the computation. We conclude, therefore, that the proper computation of NTC's earnings and profits requires the deduction of such fraud additions.

We must next determine when an accrual basis taxpayer's liability for a fraud addition first arises, since that is the time it "accrues" (whether or not contested) for purposes of computing earnings and profits. We think such liability arises when all the events determining it have occurred, *United States* v. *Anderson, supra*, and those events occur when the return is filed understating income with the intent to evade tax. *Auerbach Shoe Co.*, 21 T. C. 191, affd. (C. A. 1) 216 F. 2d 693; *De Hardit* v. *United States*, (C. A. 4) 224 F. 2d 673; *John B. Arnold*, 14 B. T. A. 954; *United States* v. *Rachmil*, (S. D., N. Y.) 270 F. 869. This principle is so obvious in the cited cases that it would serve little purpose to discuss them.

Petitioners, however, contend that the fraud addition accrues at the same time as the deficiency—that is, at the end of the taxable year to which it applies. They rely on the provisions of section 293 (a) and (b) which, when properly read together, declare that the fraud addition is to be "assessed, collected and paid in the same manner as if it were a deficiency," and on cases and rulings containing statements to the effect that the fraud addition is to be "added to" and is "a part of" the tax and that it and the tax constitute a "single liability." Petitioners jump from there to the conclusion that, for an accrual basis taxpayer, both the tax and the fraud addition accrue at the same time, viz, at the end of the year to which they apply.

An analysis of the Code provisions, plus two of the cases which petitioners themselves cite, *Auerbach Shoe Co.*, *supra*, and *Thomas J. McLaughlin*, 29 B. T. A. 247, show that petitioners confuse the *manner* of assessment, collection, and payment of the fraud addition with the *time* of its accrual. It is true that the payment required under the section 293 (b) fraud provision is regarded as an "addition to the tax," but the aforementioned authorities clearly demonstrate that that does not mean the tax and the addition *arise* at the same time; it means only that they are to be dealt with similarly for administrative purposes. Since the fraudulent act is not committed until the return is filed, approving petitioners' contention would result in accrual of the fraud addition retroactively (to the end of the preceding year). That, we think, cannot be done.

It is our conclusion, therefore, that in computing NTC's earnings and profits for the purpose of determining what portion of NTC's distributions to Samuel and Esther were dividends, each fraud addition for which we have determined NTC is liable must (even though it was contested by NTC) be deducted from earnings and profits in the year that NTC filed the return to which the particular fraud addition applies.

(b) Respondent treats the distributions received from NTC by Samuel and Esther as taxable dividends to the extent of NTC's earnings and profits, then as a tax-free return of capital to the extent of $10,000 (the cost of NTC's stock), and thereafter as taxable capital gains. Sec. 115 (a), (b), and (d), 1939 Code.

Petitioners argue that, under section 58 of the New York State Stock Corporation Law,[12] Samuel and Esther were statutorily liable to NTC's creditors to the extent of any distributions received by them in excess of NTC's surplus and therefore that such distributions are not

[12] No stock corporation shall declare or pay any dividend which shall impair its capital, nor while its capital is impaired, * * *. In case any such dividend shall be paid, * * * the directors in whose administration the same shall have been declared * * * shall be liable jointly and severally to such corporation and to the creditors thereof to the full amount of any loss sustained by such corporation or by its creditors respectively by reason of such dividend. * * *

taxable to them because they were not received under a claim of right and without restriction as to their use.

The claim of right doctrine was established in *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, wherein the Supreme Court said, at page 424:

If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money and even though he may still be adjudged liable to restore its equivalent.

The liability imposed on the directors of a corporation by section 58 of the New York statute is in the nature of indemnity and is only for the loss *actually sustained* by the corporation or its creditors as a result of the distribution impairing capital.[13]  The loss must be one in fact and the directors are not liable if, e. g., the corporation has no creditors or the creditors are able to collect their claims from the corporation out of corporate earnings accrued subsequent to the date of the distribution. *Greene* v. *Boardman*, 256 N. Y. S. 340; *Waters* v. *Spalt*, 80 N. Y. S. 2d 681; *Hayman* v. *Morris*, 36 N. Y. S. 2d 756. Consequently, circumstances may be such that no liability would be imposed on directors for declaring a corporate distribution impairing capital.

We conclude, therefore, that it could not be said at the end of each year in which the distributions in issue occurred that Samuel and Esther, as NTC's directors, would ever be called to account therefor under section 58 of the New York statute.  Moreover, there would have been no possibility whatever of Samuel's and Esther's being held liable under section 58 had it not been for respondent's determination (subsequent to the years in issue) that the sums received by Samuel and Esther actually represented fraudulently unreported sales taxable to NTC and corporate distributions from NTC to Samuel and Esther. It was that determination, concurred in in part by us and ultimately resulting in our decision that NTC was liable for deficiencies and fraud additions which greatly reduced NTC's earnings and profits, that leads to the conclusion that the distributions in issue impaired NTC's capital.

The situation here, therefore, falls within the ambit of the *North American Oil* doctrine as applied by such cases as *Healy* v. *Commissioner*, 345 U. S. 278; *Estate of Henry E. Mills*, 4 T. C. 820; and *Roberta Pittman*, 14 T. C. 449.  In those cases it was pointed out that where funds are received and treated by taxpayers as belonging to them

[13] We also note, without pausing to consider, that the statute imposes liability on the corporate *directors* for declaring a distribution which impairs capital, not on the *stockholders* who receive that distribution.  Samuel's and Esther's duty to pay capital gains taxes here stems, of course, from receiving such distributions as *stockholders*.

(as certainly was the case here), they are received under a "claim of right" even though the claim is subsequently found to be invalid. Moreover, there is no "restriction on use" where it cannot be said at the end of the tax year that the recipient would be liable for the funds received. Specifically, where the liability of the recipient turns upon a subsequent determination by respondent, or may be avoided by the corporation itself satisfying its creditors through subsequent profitable operations, then there is no restriction on use of the funds received. As said in *Healy* v. *Commissioner*, *supra*, "a potential or dormant restriction, such as here involved, which depends upon the future application of rules of law to present facts, is not a 'restriction on use' within the meaning of North American Oil v. Burnet * * *." In such cases the basic tenet of the Federal income tax law, that there be an annual accounting of income, requires that the taxpayers report the funds as income in the years received.

We hold, therefore, that the distributions received by Samuel and Esther from NTC in excess of NTC's earnings and profits plus $10,000 (the cost of NTC's stock) are taxable to them as capital gains in the years received.

*Decisions will be entered under Rule 50.*