ESTATE OF VINCENT DeNIRO, DECEASED HELEN M. PAPALIA ADMINISTRATRIX, LOUIS R. DeNIRO, TRANSFEREE, FRANK DeNIRO, TRANSFEREE, and MICHAEL DeNIRO, TRANSFEREE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ESTATE OF JAMES V. DeNIRO, DECEASED, HELEN M. PAPALIA, ADMINISTRATRIX, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Deniro v. Comm'r
Docket Nos. 9178-76, 17347-80 United States Tax Court
T.C. Memo 1990-398; 1990 Tax Ct. Memo LEXIS 415; 60 T.C.M. (CCH) 300; T.C.M. (RIA) 90398; July 30, 1990, Filed *415 Decision will be entered under Rule 155. James C. Herndon, William T. Walker, [1] and Robert W. Malone, for the petitioners. Richard S. Bloom, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to tax as follows: [2] Docket No. 9178-76 Addition to Tax
Year
Deficiency
Sec. 6651(a)(1)
1969
$ 46,268.20
$ 11,567.05  Docket No. 17347-80
Year
Deficiency
1979
$ 10,602.85 Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years 1969 and 1979. All Rule references are to the Tax Court Rules of Practice and Procedure. Docket No. 9178-76 is before this Court on remand from the United States Court of Appeals for the Sixth Circuit for a second time. [3] *416 In Estate of DeNiro v. Commissioner, T.C. Memo. 1985-128, John H. Rogan (herein "Mr. Rogan"), a certified public accountant employed by National Cigarette Service of Youngstown (herein "NCS"), testified that as of January 1, 1969, NCS had a deficit accumulated earnings and profits (herein "E & P") of $ 96,335.90. We found his testimony highly questionable. Accordingly, we found petitioner failed to carry its burden of proving that the $ 89,257.04 payment NCS made on behalf of the Estate was something other than dividend income to the Estate. On appeal, the United States Court of Appeals for the Sixth Circuit found Mr. Rogan's unrebutted testimony not "improbable, unreasonable, or questionable," and concluded it was inherently unfair to discredit it when Mr. Rogan was a credible witness. Accordingly, it reversed and remanded the case with specific instructions as follows: The Court (1) shall consider Rogan's testimony as adequate to meet the Estate's initial burden on the issue of whether NCS's payment should be characterized as a dividend and (2) shall permit the Commissioner to cross-examine Rogan, to present impeachment evidence, *417 and to present rebuttal evidence with respect to NCS's accumulated earnings and profits. [Estate of DeNiro v. Commissioner, 795 F.2d 582, 585 (6th Cir. 1986).] The Court also stated "the Tax Court may also consider the Commissioner's argument that the entire amount paid by NCS is taxable as a discharge of obligations" under section 61(a)(12). Estate of DeNiro v. Commissioner, supra.
On September 26, 1988, pursuant to such mandate, respondent cross-examined Mr. Rogan. These cases were consolidated for trial, briefing, and opinion. I. Docket No. 9178-76
The issue for decision is whether respondent sufficiently rebutted Mr. Rogan's testimony that, as of December 31, 1969, NCS had insufficient E & P to characterize the full $ 89,257.04 distribution as a dividend. II. Docket No. 17347-80
The issues for decision are whether petitioner (1) received $ 56,098.59 interest income; and (2) is allowed a $ 15,500 deduction for attorney fees. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein. Petitioner, an estate (herein "petitioner" or the "Estate"), was domiciled in and administered under *418 the laws of Ohio, under the jurisdiction of the Probate Court of Mahoning County, Ohio, at the time both petitions in these cases were filed. Louis R. DeNiro, Frank DeNiro, and Michael A. DeNiro resided in Youngstown, Ohio, at the time the petition in docket No. 9178-76 was filed. Helen M. Papalia, the administratrix, resided in Struthers, Ohio, at the time the petition in docket No. 17347-80 was filed. [4]
I. Docket No. 9178-76
To the extent necessary, we find the facts to be as set forth in the findings of fact in our opinions filed in the Estate of DeNiro v. Commissioner, T.C. Memo. 1982-497, and Estate of DeNiro v. Commissioner, T.C. Memo. 1985-128.Additionally, we make the following findings of fact for purposes of determining NCS's E & P. A. NCS's Corporate tax returns
NCS is an accrual-basis taxpayer and files its Federal income tax returns on a calendar year basis. NCS retained Mr. Rogan to participate in an Internal Revenue Service (herein "IRS") audit of its corporate Federal income tax returns for taxable years 1962 through 1967. On or around December 23, 1970, the *419 IRS completed the audit making various adjustments to NCS's taxable income for those years. [See Appendixes A and B]. No amended returns were filed reflecting these adjustments. NCS filed its Federal corporate income tax return for 1968 before the IRS completed its audit. On August 25, 1971, NCS filed a Form 1120X (Amended U.S. Corporate Income Tax Return) for 1968 adjusting, among other things, its cost of goods sold, depreciation, and interest deductions. These adjustments produced an $ 8,003.48 refund, and an unused 1968 investment tax credit of $ 147.31. Accordingly, NCS amended its 1965 return to reflect the 1968 investment tax credit carryback, and claimed a $ 147.31 refund. [See Appendixes A, C and D]. The claims for refund were allowed. On or about June 15, 1970, NCS filed its Federal corporate income tax return for 1969. On September 14, 1971, NCS filed a Form 1120X for 1969 to claim a $ 89,257.04 [5] business expense deduction. [See Appendixes A and C]. The amended return reflected a $ 40,494.05 net operating loss and a refund due of $ 8,040.21. Accordingly, NCS amended its 1966 and 1967 corporate returns to reflect a $ 19,309.61 and a $ 21,184.44 net operating loss *420 carryback to those years, respectively. The $ 19,309.61 loss carried back to 1966 produced a $ 2,330.26 unused investment tax credit which, when carried back to 1963, produced a $ 2,330.26 refund. The $ 21,184.44 loss carried back to 1967 did not itself produce an unused investment tax credit in 1967. [6] *421 As a result of these adjustments, NCS filed claims for refunds totaling $ 19,653.06. [7] [See Appendixes C and D]. On January 31, 1972, the $ 8,041.21 claim for refund was allowed. On May 1, 1972, the remaining claims for refund were allowed. On January 31, 1977, the United *422 States filed a complaint in the United States District Court for the Northern District of Ohio, Eastern Division, to recover the refunds attributable to the 1969 net operating loss, claiming NCS was not entitled to deduct the $ 89,257.04 payment. On March 21, 1979, the suit was settled by the parties and dismissed by the Court. The settlement required that NCS pay the IRS $ 7,000. B. Mr. Rogan's E & P calculations
Mr. Rogan prepared a "Reconciliation of Retained Earnings Account" statement, as part of the 1968 and 1969 amended returns, concluding that NCS had deficit E & P and retained earnings accounts of $ 96,335.90 and $ 153,132.16, as of December 31, 1968, and December 31, 1969, respectively. To arrive at the $ 153,132.16 deficit balance, Mr. Rogan took the retained earnings balance, as of December 31, 1967, from NCS's 1967 Corporate Income tax return as originally filed, i.e., ($ 105,484.64). To that he added and subtracted adjustments relating to (1) the IRS audit (taxable years 1962 through 1967); (2) the amended 1968 return; and (3) the amended 1969 return as follows: R/E balance as of December 31, 1967
- Per Original Return:
($ 105,484.64)
Adjustments to R/E based on IRS
Audit (1962 - 1967)
Additional cost of vending
machines
$ 16,821.04
Additional deferred and
prepaid interest
31,198.27
Additional depreciation
deduction
($  2,362.64)
Additional deduction for tax
expenses
(   3,476.00)
Accrual of sales tax
expense
(  10,965.76)
Adjustment for stock
redemption (1963)
*(  14,800.00)
Revised R/E balance as of December
31, 1967:
(89,069.73)
R/E balance as of January 1, 1968: (89,069.73)
Adjustments:
Corrected taxable income
for 1968
9,719.91
Income tax deficiency for
1961
*(   7,952.34)
Income tax liability for
1967
*(   9,033.74)
R/E balance as of December 31, 1968:
(96,335.90)
R/E balance as of January 1, 1969: (96,335.90)
Adjustments at December 31,
1969:
Corrected net income for
1969
(  40,494.05)
Provision for federal
income taxes
(   8,040.21)
Non-deductible tax
adjustments
*(   8,262.00)
R/E balance as of December 31,
1969:
(153,132.16)
*423 Two weeks before trial Mr. Rogan verified NCS's 1969 trial balance sheets concluding that his deficit $ 153,132.16 accumulated E & P balance was correct. To further substantiate this balance, Mr. Rogan prepared an additional balance sheet entitled "Computation of Adjusted Taxable Net Income, Retained Earnings, and Accumulated Earnings & Profits as of December 31, 1969." Beginning with his December 31, 1969, $ 153,132.16 deficit balance, and working back to 1961, Mr. Rogan computed NCS's retained earnings and accumulated E & P for each year taking into account the IRS audit adjustments made to taxable years 1962 through 1967. His bottom line results were as follows: TAX YEAR
BEGINNING
R/E BALANCE
ACCUMULATED E & P BALANCE
1962
(167,595.56)
(167,595.56)
1963
(161,981.83)
(161,981.83)
1964
(130,949.15)
(130,949.15)
1965
(123,441.14)
(123,441.14)
1966
(134,795.85)
(134,795.85)
1967
(140,186.24)
(140,186.24)
1968
( 89,069.73)
( 89,069.73)
1969
( 96,335.90)
( 96,335.90) Mr. Rogan then recalculated NCS's accumulated E & P as of December 31, 1969, by taking the January 1, 1969, $ 96,335.90 deficit and subtracting (1) the 1969 $ 40,494.05 *424 net operating loss, (2) the $ 8,262.00 (taxes paid for other years), and (3) the $ 8,040.21 (1969 taxes paid), and arrived at the $ 153,132.16 deficit balance. To this balance he made the following adjustments: YEAR
RETAINED EARNINGS
1969 ACCUM. E & P FROM FORM 1120
BALANCE SHEET - SCHEDULE-L
($ 153,132.16)      DEFICIENCY INTEREST
Tax Year 1961
(    3,002.01) *     Tax Year 1962-1967
(    4,466.99) *     Deficiencies and Additions to Tax
(Excluding Interest) Per IRS Audit
Tax Years 1962-1967
Tax Year 1962
(      478.53) *     Tax Year 1963
(    8,415.79) *     Tax Year 1964
(    3,926.72) *     Tax Year 1965
(      663.51) *     Tax Year 1966
(    2,493.20) *     Tax Year 1967
(      844.71) *     Tax Year 1968 - Income Tax Liab.
$ 12,189.81 paid $ 8,003.48
(    8,003.48) *     Tax Year 1969 (Settlement)
(    7,000.00)      INCOME TAX REFUNDS
Tax Year 1963
2,330.26      Tax Year 1964
914.25 **   Tax Year 1965
1,917.85 ***  Tax Year 1966
5,093.94 **** Tax Year 1967
8,003.48 *****
Tax Year 1968
147.31 ******
Tax Year 1969
8,040.21      TOTAL BALANCE
($ 165,979.80)
YEAR
ACCUMULATED E & P
1969 ACCUM. E & P FROM FORM 1120
BALANCE SHEET - SCHEDULE-L
($ 153,132.16) DEFICIENCY INTEREST
Tax Year 1961
(    3,002.01) Tax Year 1962-1967
(    4,466.99) Deficiencies and Additions to Tax
(Excluding Interest) Per IRS Audit
Tax Years 1962-1967
Tax Year 1962
(      478.53) Tax Year 1963
(    8,415.79) Tax Year 1964
(    3,926.72) Tax Year 1965
(      633.51) Tax Year 1966
(    2,493.20) Tax Year 1967
(      844.71) Tax Year 1968 - Income Tax Liab.
$ 12,189.81 paid $ 8,003.48
(    8,003.48) Tax Year 1969 (Settlement)
(    7,000.00) INCOME TAX REFUNDS
Tax Year 1963
2,330.26  Tax Year 1964
914.25  Tax Year 1965
1,917.85  Tax Year 1966
5,093.94  Tax Year 1967
8,003.48  Tax Year 1968
147.31  Tax Year 1969
8,040.21  TOTAL BALANCE
($ 165,979.80) *425 Based on the foregoing, Mr. Rogan concluded that as of December 31, 1969, NCS had a $ 165,979.80 deficit accumulated E & P account. Mr. Rogan neither *426 knew what NCS's accumulated E & P were for taxable years 1955 through 1960, nor did he use NCS's accounting records or tax returns from 1955 through 1960 to determine its accumulated E & P account as of January 1, 1969. Instead he treated NCS's retained earnings account as representative of its accumulated E & P, and calculated both accounts in the same manner. II. Docket No. 17347-80
A. Interest income: $ 56,098.59
On September 13, 1971, the DeNiro brothers filed claims for refund of the estate tax NCS and VLC paid in 1969. Respondent denied the claims. Accordingly, in October 1974 NCS, VLC, and the DeNiro brothers instituted a refund suit in the United States District Court for the Northern District of Ohio asserting that the $ 104,577.04 paid by the two corporations constituted an overpayment of petitioner's estate tax. [8] On June 9, 1975, the District Judge dismissed the two corporations as plaintiffs. On July 21, 1975, the jury found the Estate's value to be less than the government claimed, and entered a judgment for refund of $ 51,155.73 to the DeNiro brothers. The judgment was later amended and increased to $ 61,613 in order to allow the estate an $ 18,000 deduction for *427 attorney fees incurred in securing the refund. The United States appealed the amended judgment to the United States Court of Appeals for the Sixth Circuit. DeNiro v. United States, 561 F.2d 653 (6th Cir. 1977).The Sixth Circuit found that the District Court erred in dismissing the corporations as plaintiffs, and held that the DeNiro brothers, as executors, had standing to seek a refund on behalf of the Estate. The court vacated the District Court's judgment and remanded the case for "entry of judgment on the verdict in favor of the Estate of Vincent DeNiro" instead of the DeNiro brothers. DeNiro v. United States, 561 F.2d at 658.
On September 12, 1977, the Court of Common Pleas of Mahoning County, Ohio, appointed Joanne F. DeNicholas and Helen M. Papalia, the decedent's heirs at law, co-administratrices of the Estate. In March 1978 NCS and VLC petitioned the Probate Court of Mahoning County, Ohio, for authority to present claims to petitioner for the amounts they paid respondent with respect to petitioner's *428 estate tax assessment. On May 15, 1978, pursuant to the remand by the Sixth Circuit, the District Court entered a second amended judgment for a $ 67,741.33 refund, plus interest, in order to allow the Estate an additional $ 10,945.32 deduction for attorney fees incurred in resisting the government's appeal. Additionally, the Court ordered that the refund be paid to the Co-administratrices. [9]
*429 On March 5, 1979, respondent served upon Joanne F. DeNicholas and Helen M. Papalia, as co-administratrices of decedent's estate, (1) "Notice of Jeopardy Assessment and Right of Appeal," assessing income tax, additions to tax, and interest of $ 84,244.57 [10] for 1969, pursuant to section 6861; and (2) a "Notice of Termination Assessment of Income Tax," assessing an income tax liability of $ 10,265.21 [11] for 1979 pursuant to section 6851. On March 5, 1979, respondent set off the above-assessed taxes [12] against the $ 108,566.62 estate tax refund judgment ($ 67,741.33, [13] *430 plus $ 40,825.29 accrued interest). The balance of the refund, $ 14,105.36, was properly remitted to the Co-Administratrices of decedent's state on March 29, 1979. On April 3, 1979, and April 11, 1979, petitioner filed a protest and supplemental protest, respectively, against the jeopardy and termination assessments made by respondent. In May 1979 respondent sustained the assessment. On May 17, 1979, petitioner filed suit pursuant to section 7429(b) in the United States District Court for the Northern District of Ohio challenging the validity of the assessments. On July 10, 1979, the District Court issued a memorandum opinion and order sustaining both assessments. On February 20, 1980, a Form 1041, U.S. Fiduciary Income Tax Return, for 1979 was filed reporting only $ 48.52 of the interest income it received from respondent. On June 13, 1980, respondent issued a $ 10,602.85 notice of deficiency against the estate with respect to its 1979 taxable year. This deficiency is the same estate income tax that was the subject of the March 5, 1979, "Notice of Termination Assessment of Income Tax." The Co-Administrators timely petitioned this Court for redetermination of the deficiency. B. Attorney fees deduction: $ 15,500
In *431 1975 the District Court for the Northern District of Ohio allowed the Estate to deduct $ 18,000 in attorney fees it incurred in securing the estate tax refund. In May 1978 the District Court allowed the Estate to deduct an additional $ 10,945.32 in attorney fees it incurred in resisting the government's appeal of the refund judgment. All the estate tax refund litigation was performed on behalf of the Estate by Buckingham, Doolittle, & Burroughs Co., L.P.A. (hereinafter referred to as the " firm" or the "Buckingham firm"). On or around May 31, 1978, Joanne F. DeNicholas and Helen M. Papalia, individually and as Co-Administratrices of the Estate, entered into an agreement with NCS, VLC, and the DeNiro brothers to settle all claims they had against each other, including the estate tax refund. They also agreed that all attorneys' fees relating to the refund suit "shall be equal to the sum of one-third of the total refund plus interest awarded pursuant to the judgment in that case." Sometime thereafter, the Co-administratrices of the Estate moved the Mahoning County Probate Court to approve the May 31, 1978, agreement. On or about June 22, 1978, Judge Henderson, the Probate Judge, approved *432 the Agreement, and incorporated it into his judgment. On June 11, 1979, petitioner paid Robert J. Kalafut, as Counsel for the fiduciaries, $ 2,500 in legal fees. On December 31, 1979, petitioner paid the Buckingham firm $ 13,000 in legal fees pursuant to an invoice from the firm dated on or around December 28, 1979. On February 20, 1980, a Form 1941, U.S. Fiduciary Income Tax Return was filed with the IRS reporting $ 634.12 in income, claiming a $ 600 exemption, and no deductions for a total tax liability of $ 4.78. The fiduciaries did not deduct any of the attorney fees actually paid in 1979. On March 17, 1980, the Co-Administratrices of the Estate filed a Fiduciary's Account for accounting period February 12, 1979, to March 10, 1980, with the Probate Court of Mahoning County, Ohio. The account listed the $ 15,500 in attorney fees paid in 1979 as disbursements for 1979. Attached to the fiduciary account was a form entitled "Receipts and Disbursements" signed by "Helen M. Papalia" and "Joanne T. DeNicholas" as fiduciaries. Voucher No. 8 was for the $ 2,500 paid to Mr. Kalafut. Voucher No. 12 was for the $ 13,000 paid to the Buckingham firm. The notation beside Voucher No. 12 *433 stated "(Partial payment from I.R.S. proceeds as per agreement dated 5/31/78, on file with Mahoning County Probate Court.)" Very similiar language appears on the $ 13,000 check sent to the Buckingham firm. On April 29, 1980, Judge Henderson signed a Form 13.5, Entry Approving and Settling Account. On July 1, 1980, the Co-Administratices of the Estate filed with the Mahoning County Probate Court an "Application for Authority to Pay Attorney Fees," and an "Order Authorizing Payment Of Attorney Fee To Special Tax Counsel." The application requested the Judge approve the $ 13,000 payment to the Buckingham firm for services rendered in protesting and litigating the March 5, 1979, Jeopardy and Termination assessments. On or about July 13, 1980, Judge Henderson approved the payment and signed the attached order. OPINION I. Docket No. 9178-76
NCS's E & P
The issue for decision is whether respondent sufficiently rebutted petitioner's evidence that NCS had insufficient E & P as of December 31, 1969, to characterize the full $ 89,257.04 constructive distribution as a dividend. We find he has. Petitioner admits that in order to prove the $ 89,257.84 distribution is not fully taxable as a dividend, *434 it must provide sufficient proof (1) of NCS's current E & P for the year ending December 31, 1969, without diminution by reason of any distribution made during the year; and (2) that as of December 31, 1968, NCS had a deficit E & P accumulated since the later of February 28, 1913, or its incorporation. Sec. 316(a). On brief, petitioner concedes that Mr. Rogan failed to increase NCS's current E & P ($ 41,762.11) by $ 11,613.11, [14] *435 i.e., the refunds attributable to the 1969 net operating loss carrybacks and investment tax credit carrybacks. Although we agree with that increase, we question why neither party included the $ 8,040.21 refund from 1969 in this figure. See Rose v. Dobbs, 36 F.2d 464 (5th Cir. 1929); Webb v. Commissioner, 67 T.C. 1008 (1977).However, whether or not the $ 8,040.21 refund is added, the $ 89,257.04 distribution exceeds NCS's current E & P ($ 53,375.22 or $ 61,415.43). Accordingly, we must determine whether NCS had sufficient accumulated E & P. After reviewing all the testimony and the exhibits, we are convinced Mr. Rogan incorrectly calculated NCS's accumulated E & P balance as of January 31, 1969. Mr. Rogan and petitioners admit that they did not know what NCS's actual accumulated E & P balance was from 1955 through 1962. Therefore, Mr. Rogan presumed the retained earnings account was representative of the accumulated E & P account, and treated it accordingly. The term "earnings and profits" is not defined in the Internal Revenue Code, and does not correspond exactly to taxable income or any corporate accounting concepts, i.e., retained earnings. Thus, a corporation's retained earnings account does not necessarily reflect its "earnings and profits." See Commissioner v. Wheeler, 324 U.S. 542, 546 (1945); Stark v. Commissioner, 29 T.C. 122, 128 (1957). The most flagrant mistake Mr. Rogan made, when computing accumulated E & P as of January 1, 1969, was using NCS's December 31, 1967, retained earnings account as a starting point, i.e., a deficit $ 105,484.64. That deficit resulted from a 1967 stock redemption, not an operating loss. [15]A distribution (redemption) cannot reduce E & P below zero. Sec. 312(a); *436 Sec. 1.316-2(a)(2), Income Tax Regs. Even if we assume NCS's retained earnings account, as of January 1, 1967, properly reflected accumulated E & P, accumulated E & P as of January 1, 1968, would be zero, not a deficit $ 105,484.64. [16] See Estate of Uris v. Commissioner68 T.C. 448 (1977), affd. 605 F.2d 1258 (2d Cir. 1979);Anderson v. Commissioner, 67 T.C. 522 (1976), affd. per curiam 583 F.2d 953 (7th Cir. 1978). Thus Mr. Rogan's starting figure is incorrect. In addition to the above, Mr. Rogan made the following adjustments to his "accumulated E & P account." (1) He reduced the 1968 "E & P" by (a) the $ 7,952.34 deficiency attributable to taxable year 1961, and (b) the $ 9,033.74 tax liability for 1967. An income tax deficiency or tax liability, even though not paid and contested, properly reduces earnings and profit in the year for which it relates. See *437 Deutsch v. Commissioner, 38 T.C. 118, 124 (1962).Cf. Estate of Stein v. Commissioner, 25 T.C. 940, 965 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958); Stern Brothers & Co. v. Commissioner, 16 T.C. 295, 323 (1951). (2) He increased his 1969 accumulated E & P balance by the 1965 and 1968 refunds, i.e., $ 147.31 and $ 8,003.48, respectively. Both refunds properly increase current E & P for 1968, since neither are attributable to the net operating loss generated in 1969. See Rose v. Dobbs, supra; American Enka Corp. v Commissioner, 30 T.C. 684, 694-695 (1958); Rev. Rul. 66-336, 1966-2 C.B. 110.Additionally, all the refunds properly attributable to the 1969 net operating loss increase current E & P. They do not reduce a deficit accumulated E & P as Mr. Rogan did in his computation. (3) He reduced E & P, as of December 31, 1967, by $ 14,800.00, representing a 1963 redemption. A redemption properly reduces E & P in the year it is made, not in a subsequent year. (4) Two weeks before trial, Mr. Rogan prepared a second schedule entitled "Computation of Adjusted Taxable Net Income, Retained Earnings, and Accumulated Earnings & *438 Profits as of December 31, 1969." He testified that, following Rev. Rul. 70-531, 1970-2 C.B. 76, he made adjustments in that schedule to account for the 1963 and 1967 stock redemptions. [17]
We fail to see where these adjustments were actually made in any schedule Mr. Rogan prepared. Moreover, Helvering v. Jarvis, 123 F.2d 742 (4th Cir. 1941), affg. Jarvis v. Commissioner, 43 B.T.A. 439 (1941), not Rev. Rul. 70-531, controls the manner in which the capital account, and in turn the E & P account is reduced under section 312(e) when there is a stock redemption. See Anderson v. Commissioner, supra; Rev. Rul. 79-376; 1979-2 C.B. 133.Moreover, even if Rev. Rul. 70-351 were applicable, Mr. Rogan incorrectly applied it. As we have previously stated, a distribution cannot reduce E & P below zero. See Estate of Uris v. Commissioner, supra.
(5) As illustrated in his second schedule, Mr. Rogan reduced his 1969 accumulated E *439 & P balance by the deficiencies attributable to taxable years 1962 through 1967. Those deficiencies arise out of the IRS audit, and reduce E & P in their respective years, i.e., the year attributable to the deficiency, not in the year the issues were finally settled. See Deutsch v. Commissioner, supra; Estate of Stein v. Commissioner, supra.Cf. American Enka Corp. v. Commissioner, supra.Likewise, the additions to tax reduce earnings and profit in the year that the "all-events test" is met, not in the year the issues are settled or the amounts actually paid. See Estate of Stein v. Commissioner, supra; Kenner v. Commissioner, T.C. Memo. 1975-118.
(6) He reduced his 1969 accumulated E & P account balance by $ 3,002.01 and $ 4,466.99, i.e., interest on the 1961 and the 1962 through 1967 deficiencies. Interest on deficiencies accrues ratably from the due date of the tax. Thus E & P is reduced ratably. Stark v. Commissioner, 29 T.C. 122 (1957). (7) Finally, Mr. Rogan attempts to verify his 1969 deficit E & P figure by working the December 31, 1969, deficit $ 153,132.16 backwards to 1961. In so doing, he concludes that NCS had deficit accumulated E & P, and retained earnings accounts *440 each year beginning January 1, 1962, and ending December 31, 1969. NCS, however, did not have a deficit retained earnings' account until December 31, 1967, as evidenced by its tax returns. [See Appendix A]. Accordingly, we find Mr. Rogan's "Computation of Adjusted Taxable Net Income, Retained Earnings, and Accumulated Earnings & Profits as of December 31, 1969" incorrect and totally unpersuasive. Assuming, as petitioners and Mr. Rogan did, NCS's retained earnings account, as of January 1, 1961, accurately reflected its accumulated E & P account, and making appropriate adjustments thereto based on the evidence presented here, we conclude NCS had a positive accumulated E & P account of $ 17,870.56 as of December 31, 1969. [See Appendix E]. Based on the foregoing we conclude that $ 79,286.87 of the $ 89,257.04 distribution constitutes ordinary income under section 301. II. Docket No. 17347-80
A. Interest income
We must decide whether petitioner received $ 56,098.59 interest income in 1979. Petitioner concedes it actually received $ 14,105.36 interest income, $ 14,056.84 of which was not reported in 1979. It denies "constructively" receiving the remainder, i.e., $ 41,993.23. Respondent *441 contends petitioner "constructively" received $ 41,993.23 interest income in 1979 when he setoff the $ 108,566.62 estate tax refund against the 1969 and 1979 liabilities. We agree with respondent. Petitioner reports income and deductions under the cash receipts method of accounting. Cash basis taxpayers report income for the year in which it is (1) actually received in cash or its equivalent, or (2) constructively received. Sec. 451(a); sec. 1.451-2(a), Income Tax Regs.
Under the doctrine of constructive receipt, income is constructively received when it is credited to the taxpayer's account, or otherwise made unconditionaly available to him. Income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. Sec. 1.451-2(a), Income Tax Regs.
On March 5, 1979, respondent was indebted to petitioner for $ 108,566.62. Respondent also determined that petitioner was indebted to him for $ 94,509.78, i.e., $ 84,244.57 for 1969 and $ 10,265.21 [18] for 1979. Accordingly, on March 29, 1979, respondent applied the assessed liabilities for 1969 and 1979 against the $ 108,566.62 refund, and refunded the remaining $ 14,105.36 *442 to petitioner. After reviewing the evidence we find petitioner constructively received $ 41,993.23 [19] *443 in interest income on March 29, 1979. Latendresse v. Commissioner, 26 T.C. 318 (1956), affd. 243 F.2d 577 (7th Cir. 1957), cert. denied 355 U.S. 830 (1957); Herbert v. Commissioner, 32 B.T.A. 372 (1935), affd. 81 F.2d 912 (3d Cir. 1936); Estate of Buder v. Commissioner, T.C. Memo. 1963-73. Cf. Lewis v. Commissioner, T.C. Memo. 1954-232. Moreover, we agree with respondent that petitioner is entitled to deduct the $ 26,719.94 interest it constructively paid in 1979 on the 1969 liability. See Eboli v. Commissioner, 93 T.C. 123, 129 (1989) citing Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 439-440 (1969), and Jergens v. Commissioner, 17 T.C. 806, 810 (1951). B. Attorney fees deduction
The final issue for decision is whether petitioner may deduct the $ 15,500 attorney fees paid in 1979. We find the $ 2,500 petitioner paid Mr. Kalafut *444 deductible. Mr. Kalafut was hired by the Co-Administrices after his appointment in 1977 to help administer the Estate. There is no evidence that the $ 2,500 comprises any portion of the $ 28,945.32 attorney fees the District Court allowed the Estate to deduct under section 2053. Accordingly, we find the evidence sufficient to support petitioner's claim for that deduction. However, we find the $ 13,000 petitioner paid the Buckingham firm nondeductible. Petitioner alleges that the $ 13,000 payment is related solely to the 1979 jeopardy and termination assessments litigation. However, the evidence indicates it represented partial payment for the firm's services in the Estate's tax refund litigation. The check made out to the Buckingham firm, and the second fiduciary statement both indicate the payment was made as partial payment from IRS proceeds pursuant to the May 31, 1978, agreement. The only attorney fees mentioned in that agreement were those connected with the refund suit. Petitioner, however, argues that the language contained on both documents "is very patently a mistake by the person who prepared the account * * * probably Mr. Kalafut * * *." Petitioner's failure to call *445 Mr. Kalafut to testify on this matter leads us to infer that his testimony would not have been favorable. Pollock v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Additionally, petitioner argues that the December 28, 1979, invoice from the Buckingham firm, together with the approved "Application for Authority to Pay Attorney Fees," further establishes that the $ 13,000 was paid to the firm solely for its work on the 1979 litigation. We find this evidence unpersuasive. We believe the only reason petitioner filed the "Application for Authority to Pay Attorney Fees" was to establish a record in an attempt to persuade this Court that the $ 13,000 was related to the 1979 litigation, rather than the 1975-1978 refund litigation. This is supported by the fact that the Probate Court had already approved that $ 13,000 payment on April 29, 1980, when it approved the Fiduciary Account. Additionally, we note that the Application was filed with the Probate Court after petitioner received respondent's notice of deficiency for taxable year 1979. Accordingly, *446 since petitioner deducted the $ 28,945.32 under section 2035 as a claim against the Estate, the actual payment of any portion of that claim is not deductible in the year it is actually paid. Sec. 641(g). In accordance with the foregoing, Decisions will be entered under Rule 155. APPENDIX A Taxable Income and Retained Earnings as Originally Reported
Taxable Years 1963 through 1969
1963
1964
1965
1966
Taxable Income:
$ 19,706.01
$ 17,604.22 (4,681.86)
16,969.16 Tax Liability:
5,911.80
minus
1,279.81
Net Tax Liability:
4,631.99
2,319.20 -0-   none     R E as of 1/1
26,268.42
45,974.43 62,935.69 58,253.83 Adjustments
to R E  :
19,706.01
17,604.22 (4,681.86)
16,969.16 (642.96)
(4,626.48)
* *447 ( 2,700.00)
R E as of
12/31:
45,974.43
62,935.69 58,253.83 67,896.51 Capital Account:
as of 1/1:
45,000.00
$ 45,000.00 42,600.00 40,200.00 as of 12/31:
45,000.00
42,600.00 40,200.00 40,500.00 1967
1968
1969
Taxable Income:
37,000.71 40,376.06 33,031.64 Tax Liability:
10,290.71 minus
2,250.50 Net Tax Liability:
9,033.74 12,189.81 8,040.21 R E as of 1/1
67,896.51 (105,484.64)
(71,441.31)
Adjustments
to R E  :
37,000.71 40,376.06 33,031.64 ** (210,350.00)
* (2,800.00)
(15,373.32)
(31.86)
(3,532.73)
R E as of
12/31:
(105,484.64)
(71,441.31)
53,782.99)
Capital Account:
as of 1/1:
40,500.00 29,250.00 9,250.00 as of 12/31:
29,250.00 29,250.00 29,250.00 APPENDIX B Corrected Taxable Income and other items after
1971 IRS Audit and Adjustments Taxable Years 1962 through 1967
1962
1963
1964
1965
Taxable Income:
$ 5,631.71
$ 39,014.67
$ 31,027.21
$ 13,845.29
Tax Liability:
1,689.52
14,787.63
8,513.60
3,045.96 minus ITC:
1,210.99
1,739.85
2,267.68
2,515.15
Net Tax Liability:
478.53
13,047.78
6,245.92
530.81
Deficiency
478.53
8,415.79
3,926.72
530.81
Overassessment
Additions to tax:
6651(a)
--
--
--
106.16
6653(a)
--
--
--
26.54
1966
1967
Taxable Income:
$ 19,309.61
$ 35,401.60 Tax Liability:
4,248.11
10,492.77 minus ITC:
2,330.26
2,893.96 Net Tax Liability:
1,917.85
7,598.81 Deficiency
1,917.85
Overassessment
(1,434.93)
Additions to tax:
6651(a)
479.46
1,899.70 6653(a)
95.89
379.94 APPENDIX C AMENDED 1968 AND 1969 RETURNS AS FILED
1968
1969
Taxable Income:
$  9,719.91 ($  40,494.05)
Tax Liability:
-0-  -0-  R E as of 1/1
(89,069.73)
(96,335.90)
Adjustments to
R E:
9,719.91 (40,494.05)
* *448 ( 7,952.34)
*** (  8,040.21)
** ( 9,033.74)
**** (  8,262.00)
R E as of
12/31:
(96,335.90)
(153,132.16)
Capital Account
as of 1/1:
29,250.00 29,250.00 as of 12/31:
29,250.00 29,250.00 APPENDIX D Taxable Income and Liability Per Amended Returns after
1969 NOL Carryback and ITC adjustments
1962
1963
1964
1965
1966
Taxable Income:
na
$ 10,717.52
$ 5,331.67
$ 383.50
-0- Refund
na
2,330.26
* 914.25
** 147.31
1,917.85
1967
1968
1969
Taxable Income:
$ 2,279.64
$ 9,719.91
($ 40,494.05)
Refund
*** 7,365.00
** 8,003.48
8,040.21 APPENDIX E CALCULATION OF PROFIT BASED ON THE EVIDENCE
In the following calculation we assume that (1) retained earnings as of December 31, 1962 accurately reflects NCS's (current and accumulated) *449 E & P, and (2) all returns were filed within the year they were originally due. *12/31/61
$ 21,115.22  ESTIMATED R/E
(7,952.34) 1961 DEFICIENCY PAID IN 1979
13,162.88  *1/1/62
$ 13,162.88  ESTIMATED ACCUMULATED E & P
5,631.73  TAXABLE INCOME PER AUDIT
( 478.53) TAX LIABILITY
$ 18,316.08  1/1/63
$ 18,316.08  ACCUMULATED E & P
39,014.67  TAXABLE INCOME
(4,631.99) TAX LIABILITY PER ORIGINAL RETURN
(8,415.79) DEFICIENCY
12/31/63
25,966.89  CURRENT E & P
* (19,000.00) STOCK REDEMPTION REDUCTION
$  6,966.89  CURRENT E & P
1/1/64
$ 25,282.97  ACCUMULATED EARNINGS AND PROFIT
31,027.21  TAXABLE INCOME
(2,319.20) TAX LIABILITY PER ORIGINAL RETURN
(3,926.72) DEFICIENCY
12/31/64
$ 24,781.29  CURRENT E & P
1/1/65
$ 50,064.26  ACCUMULATED E & P
13,845.29  TAXABLE INCOME PER AUDIT
(  -0-    ) TAX LIABILITY PER ORIGINAL RETURN
(530.81) DEFICIENCY
12/31/65
$ 13,314.48  CURRENT E & P
1/1/66
$ 63,378.74  ACCUMULATED E & P
19,309.61  TAXABLE INCOME PER AUDIT
(   106.16) SECTION 6651(a) ADDITION FOR 1965
(    26.54) SECTION 6653(a) ADDITION FOR 1965
(    -0-  ) TAX LIABILITY PER ORIGINAL RETURN
(  1,917.85) DEFICIENCY PER AUDIT
12/31/66
$ 17,259.06  CURRENT E & P
(  2,700.00) STOCK REDEMPTION
$ 14,559.06  CURRENT E & P
1/1/67
$ 77,937.80 ACCUMULATED EARNINGS AND PROFIT
35,401.60  TAXABLE INCOME PER AUDIT
(   479.46) SECTION 6651(a) ADDITION FOR 1966
(    95.89) SECTION 6653(a) ADDITION FOR 1966
( 7,598.81) CORRECTED TAX LIABILITY PER AUDIT
12/31/67
27,227.44  CURRENT E & P
** *451 (105,165.24) STOCK REDEMPTION OF $ 220,000.00
-0-    ACCUMULATED E & P
1/1/68
-0-    ACCUMULATED E & P
$  9,719.91  AMENDED TAXABLE INCOME
-0- TAX LIABILITY
*** 147.31  REFUND FROM 1965 ATTRIB TO ITC
CARRYBACK FROM 1968
12/31/68
$ 9,867.22  CURRENT E & P
****** 8.003.34  REFUND FOR 1968
$ 17,870.56  CURRENT E & P
1/1/69
$ 17,870.56  ACCUMULATED E & P
***** 41,762.99  CORRECTED TAXABLE INCOME
*** 2,330.26  REFUND ATTRIBUTABLE TO 1963
**** 1,917.85  REFUND ATTRIBUTABLE TO 1966
*** 7,365.00  REFUND ATTRIBUTABLE TO 1967
****** 8,040.21  REFUND ATTRIBUTABLE TO 1969
$ 61,416.31  CURRENT E & P
$ 79,286.87  TOTAL CURRENT AND ACCUMULATED E & P
*450 Footnotes
1. Mr. Walker withdrew as counsel so he could testify.↩
2. Respondent deducted the $ 23,577.04 interest petitioner constructively paid on its estate tax liability from the $ 104,577.04 income it constructively received before he calculated petitioner's income tax liability.↩
3. See Estate of DeNiro v. Commissioner, 795 F.2d 582 (6th Cir. 1986), revg. and remanding T.C. Memo. 1985-128; Estate of DeNiro v. Commissioner, 746 F.2d 327 (6th Cir. 1984), affg. in part and remanding in part T.C. Memo. 1982-497↩.
4. Joanne F. DeNicholas was allowed to withdraw as coadministratrix of the Estate on September 21, 1988.↩
5. This $ 89,257.04 represents the payment NCS made to satisfy petitioner's estate tax assessment.↩
6. NCS had a $ 2,893.96 investment tax credit available in 1967 before the 1969 and 1970 net operating losses were carried back. If the 1969 and 1970 net operating loss carrybacks are treated separately, i.e., FIFO method, the following results: (1) The $ 21,184.44 1969 net operating loss carried back to 1967 reduces taxable income in 1967 from $ 35,401.60 to $ 14,217.44. Thus, NCS's tax liability is reduced from $ 10,492.77 to $ 3,127.77. Accordingly, the full $ 2,893.96 credit is available to offset the $ 3,127.77 tax liability, leaving a $ 233.81 tax liability in 1967. (2) The $ 5,218.47 net operating loss in 1970 reduces the 1967 taxable income to $ 1,979.71,(after taking into account the 1969 NOL), and the investment credit available for 1967 is now limited to $ 1,979.71, leaving $ 914.25 unused credit available to carryback to 1964. However, if the 1969 net operating loss carryback is applied to the investment credit first, then no investment tax credit is available for the 1970 loss. Thus the $ 914.25 unused investment credit carried back to 1964 produces a refund in 1964. Accordingly, the 1964 refund is due to the 1970 net operating loss not the 1969 net operating loss. The $ 5,218.47 net operating loss from 1970 multiplied by rate (22 percent) equals $ 1,148.06. The $ 1,148.06 represents the tax saved by the 1970 NOL. Before the 1970 carryback, 1967's tax liability was $ 233.81. After the 1970 carryback, a $ 914.25 unused investment tax credit existed. The $ 233.81 plus $ 914.25 equals $ 1,148.06.↩
7. 1963 - $ 2,330.26 1966 - $ 1,917.85 1967 - $ 7,365.00* 1969 - $ 8,040.21 All of these adjustments are improper if computing the E & P available for 1969.
*↩ The total refund was $ 7,598.81. However, $ 233.81 is attributable to the net operating loss carried back from 1970.
*. All these adjustments reduce E & P in a year other than 1969. The deficiencies reduce E & P attributable to the years they were determined and the additions to tax reduce the E & P attributable to the earlier of the year the returns were filed or their due date. Cf. Estate of Stein v. Commissioner, 25 T.C. 940, 967 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798↩ (2d Cir. 1958).
**. This properly increases the 1970 current E & P. Rev. Rul. 75-153, 1975-1 C.B. 107. See Rose v. Dobbs, 36 F.2d 464↩ (5th Cir. 1929).
***. This is the refund for 1966, not 1965, and properly increases current E & P for 1969.↩
****. This is the portion of the refund for 1967, not 1966. The correct amount is $ 7,598.81, $ 7,365.00 of which is properly attributable to the 1969 net operating loss carryback. Accordingly, $ 7,365.00 increases current E & P for 1969.↩
*****. This figure is the refund for 1968, not 1967, and properly increases the 1968 current earnings and profits.↩
******. This figures is the refund for 1965, not 1968, and properly increases E & P for 1968.↩
8. National Cigarette Service of Youngstown, Ohio, Inc., et al., v. United States of America, an unreported case ( N.D. Ohio, 1975, 36 AFTR 2d 75↩-6517) Civil Action No. C-74-230-Y.
9. National Cigarette Service of Youngstown, Inc., et al., v. United States, an unreported case, ( N.D. Ohio, May 15, 1978, 42 A.F.T.R.2d 6502). The Court found that the estate tax liability as follows: ↩
ASSETS
Cicero's Inc. 100% interest
$ 110,000.00 Valley Land Company -- 100% interest
79,000.00 National, Inc. -- 65% interest
40,950.00 Cash
50,000.00 Insurance
16,000.00 TOTAL GROSS ESTATE
$ 295,950.00 LIABILITIES
Funeral Expenses
$  4,000.00 Debt owed to Edward Cochran
32,000.00 Notes payable to Marino
77,000.00 Legal fees- U.S. District Court
18,000.00 Legal fees - U.S. Ct. of Appeals
10,945.32 TOTAL LIABILITIES
$ 141,945.32 Adjusted Gross Estate
$ 154,004.68 Less: Exemption
60,000.00 TAXABLE ESTATE
$  94,004.68 Estate Tax
$  19,021.31 Fraud Addition
9,510.66 Interest
8,303.74 TOTAL ESTATE TAX LIABILITY
$  36,835.71  The May 15, 1978, judgment reflects this finding.
10. The $ 84,244.57 represents $ 46,268.00 in estate income tax, $ 11,567.05 in an addition to tax, and $ 26,409.32 in interest.↩
11. The $ 10,265.21 was calculated by taking the $ 56,098.59 interest income, and reducing it by the $ 26,409.32 interest "paid" in 1979 by reason of setoff, but not previously deducted by the estate.↩
12. ↩
Income Tax, Addition to tax, and Interest for 1969
84,244.57
Income Tax, for 1979
10,265.21
TOTAL
$ 94,509.78
13. The $ 67,741.33 principal amount represents the total of the $ 34,978.69 estate tax liability, the $ 17,489.34 addition to tax, and the $ 15,273.30 interest paid.
14. Petitioner calculates the $ 11,613.11 increase by adding the refunds from 1963 ($ 2,330.26), 1966 ($ 1,917.85), and $ 7,364.99 of the 1967 refund together. This is added to $ 41,762.11 to arrive at a total current E & P of $ 53,375.22.
15. NCS redeemed 25 shares of its stock for $ 220,000 ($ 210,350.00 representing the reduction to retained earnings), and reduced its retained earnings account from a positive $ 104,897.22 to a deficit $ 105,452.78.↩
16. This is true even if we assume that before the redemption the retained earnings account properly reflected E & P.↩
17. According to his testimony he reduced (1) the 1963 E & P by $ 16,519.00 thereby reducing accumulated E & P down from ($ 148,000.00) to ($ 132,152.03); and (2) the 1967 E & P by $ 40,109.746, thereby reducing accumulated E & P down from ($ 128,351.00) to ($ 88,241.44).↩
18. We note that the setoff occurred after the termination assessment was made. Accordingly, it was impossible for petitioner to have constructively received any income before the setoff occurred, i.e., March 29, 1979. See Rogan v. Mertens, 153 F.2d 937↩ (9th Cir. 1946). However, because petitioner received, either actually or constructively, $ 56,098.59 of interest income in 1979 and is taxable on it, we believe this error to be harmless.
19. The $ 56,098.59 interest is comprised of $ 40,825.29 accrued interest, plus $ 15,273.26 of the principal amount of refund (i.e., $ 67,741.33). The record reflects that (1) the Estate was assessed $ 23,577.00 interest which was paid on behalf of the Estate in 1969; (2) respondent reduced the Estate's $ 104,577.04 constructive income by the constructively paid $ 23,577.00 interest to arrive at the $ 46,268.20 deficiency. A reduction of previously assessed interest constitutes interest income, if at all, under a tax benefit analysis. The tax benefit rule includes an item in gross income where that item has been deducted in an earlier year, and a later unforeseen event occurs which is "fundamentally inconsistent with the premise on which the deduction was initially based." Hillsboro National Bank v. Commissioner, 460 U.S. 370, 383↩ (1983).Accordingly, because petitioner received a tax benefit from a previous deduction, section 111 applies to the $ 15,273.26 portion of the total refund.
*. Represents reduction to earnings and profit for stock redemptions.
**. Represents reduction to earnings and profits for a $ 220,000.00 stock redemption.↩
*. Income Tax deficiency for 1961. This reduction is incorrect if computing E & P. It should reduce 1961's E & P and flow through from there. See Mr. Rogan's calculations, infra.
***. Income Tax for 1969↩
**. Income Tax for 1967. This adjustment is also incorrect. It should adjust E & P for 1967 only. See Mr. Rogan's calculations, infra.↩
****. Non-deductible tax adjustments↩
*. This refund is attributable to an unused ITC carryback from 1967 which resulted from a net operating loss carryback from 1970.↩
**. These refunds are the result of the 1968 amended return and the carryback to 1965 of unused ITC in 1968.↩
***. $ 7,598.81 is the total refund for 1967. $ 233.81 resulted from the carryback of a 1970 net operating loss.↩
*. Redemption of 10 shares for $ 24,000.00. The 10 shares of stock redeemed divided by 90 shares outstanding before the redemption multiplied by the current capital account of $ 45,000.00 equals $ 5,000.00. This $ 5,000.00 reduces the capital account and the remaining $ 19,000.00 reduces the E & P account.↩
*. The only information we have concerning these two years is as follows: (1) As of 12/31/62 NCS reported it had retained earnings of $ 26,268.42. This was reflected on NCS's 1963 Schedule M, i.e., beginning balance. (2) An IRS audit determined a $ 7,952.34 total deficiency and interest for taxable year 1961. (3) NCS had $ 5,631.73 taxable income in 1962 and a $ 478.53 deficiency. With this information we were able to estimate NCS's retained earnings (or E & P) for taxable years 1962 and 1961 by working backwards as follows: ↩
R/E as reported
12/31/62
$ 26,268.42
- $ 5,631.73 + $ 478.53 = $ 21,115.22 Estimated
12/31/62
$ 21,115.22 - Deficiency of $ 7,952.34 = $ 13,162.88
Estimated
1/1/62
$ 13,162.88 + $ 5,631.73 - $ 478.53 = $ 18,316.08 Adjusted R/E -
12/31/62
$ 18,316.08
**. The 25 shares of stock redeemed for $ 220,000.00. 25 shares divided by the 80 shares outstanding before the redemption multiplied by $ 35,500.00 current capital account equals $ 11,094.00. The $ 11,094.00 is charged to capital account and the remaining $ 208,906.00 reduces E & P. However, since a distribution can not create a deficit E & P, E & P is reduced to zero.
***. See Rev. Rul. 75-153, 1975-1 C.B. 106↩.
******. Tax refund for a particular year increases E & P of an accrual-basis corporation for that year though the amount was unknown then. Rose v. Dobbs, 36 F.2d 464↩ (5th Cir. 1929)
*****. Reflects the disallowance of the $ 89,257.04 deduction computed as follows: ↩
Total Income: 130,242.21 Total Ded: ( 81,479.22) ( 7,000.00) 1979 SETTLEMENT PAYMENT
Total Tax. Inc. 41,762.04
****. Rev. Rul. 64-146↩, 1964-1 C.B. (Part 1) 129.