T.C. Memo. 1998-371


UNITED STATES TAX COURT


PAUL ARTHUR ZIPP, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9216-96.                    Filed October 13, 1998.


Paul Arthur Zipp, pro se.

<u>Shirley M. Francis</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income tax and fraud penalties for taxable years 1990, 1991, and 1992 as follows:

| Year | Deficiency | Penalty Sec. 6663 |
|------|-----------|-------------------|
| 1990 | $124,387 | $93,290 |

| 1991 | 256,233 | 192,175 |
| 1992 | 86,650 | 61,988 |

As an alternate position, respondent determined that, if the fraud penalty does not apply, petitioner is liable for the accuracy-related penalty under section 6662(a) for negligence or substantial understatement of tax for each of the years in issue.

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated

After concessions by the parties,[1] the issues to be decided are as follows:

1. Whether petitioner failed to report gross receipts of $344,225 for 1990, $666,563 for 1991, and $53,330 for 1992.

2. Whether petitioner is entitled to offsets and business deductions in excess of those allowed by respondent for the 1992 taxable year.

3. Whether petitioner is entitled to an embezzlement loss deduction for the 1990 taxable year.

4. Whether petitioner is liable for the fraud penalty under section 6663 for the 1990, 1991, and 1992 taxable years.

---

[1]Petitioner concedes that he is not entitled (1) to the alimony deduction he claimed on his income tax returns for the taxable years 1990, 1991, and 1992, and (2) to business deductions for payments of $49,685 and $45,700 made to Julie Anne Stanbery during 1990 and 1991.

5. Whether the assessment of a deficiency for the 1990 taxable year is barred by the statutory period of limitations.

6. Whether petitioner is liable for the accuracy-related penalty under section 6662(a) for the 1990, 1991, and 1992 taxable years.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Petitioner is a licensed radiologist who resided in Roseburg, Oregon, when the petition in this case was filed. Petitioner received his bachelor's degree from the University of California at Santa Barbara and his medical degree from the University of California at San Francisco. He completed an internship and residency at the University of Colorado Medical Center in Denver. After completing his residency, petitioner served in the U.S. Navy for 2 years.

From 1977 until 1983, petitioner was chief of the radiology department at the Columbia District Hospital in St. Helens, Oregon, and also worked in the hospital's emergency room. Petitioner incorporated his practice in St. Helens. Petitioner's accountant recommended that he incorporate the practice so that petitioner could keep his business separate from his personal affairs and maximize his pension contributions.

From 1983 until 1989, petitioner practiced radiology in Seattle, Washington. In March 1989, petitioner began practicing at the Highline Community Hospital in Burien, Washington, as chief of radiology.

On average, petitioner worked 14 to 18 hours a day at the Highline Community Hospital and provided services to 100 patients a day (over 30,000 per year). Petitioner provided patients a broad range of services, including plain film analysis, mammography, intravenous pyelography, computerized tomography, ultrasound, nuclear medicine, magnetic resonance imaging, and interventional radiology. An employee of the hospital would screen a patient who came to the hospital and would take the patient's name, address, and insurance information. The patient would then go to the department with a request slip indicating the procedure requested by the patient's doctor. The request slip had three parts, the last of which was a pink slip that petitioner used for billing purposes. The Highline Community Hospital billed the radiology patients for the use of its equipment, and petitioner billed the patients separately for his professional services. After petitioner performed the radiology procedure, the fee for petitioner's services was marked on the pink slip. The pink slips were then batched daily and sent by courier to petitioner's billing service. Petitioner did not

maintain a log of the information on the pink slips but relied on the billing services to accurately account for the billing.

Petitioner used three unrelated billing services to collect his fees from patients. Petitioner used Professional Financial Services from March 1989 until the end of that year; he used Hagy & Hagy until June 1990; and he used Lynx Medical from June 1990 until December 1991. Petitioner resigned from the Highline Community Hospital effective September 1, 1991, and used Professional Financial Services to collect the residual receivables remaining after December 1991. After petitioner retired, he moved to Roseburg, Oregon.

The billing services billed petitioner's patients and their insurance carriers, collected the payments, and deposited the payments into petitioner's main bank account at First Interstate Bank (the main account). For these services, the billing services billed petitioner a percentage of the receivables collected, usually 11 percent to 14 percent. The billing services collected approximately 50 percent of the gross charges, primarily because of disallowances by insurance carriers. The billing services sent petitioner lengthy monthly statements of his accounts.

Occasionally a billing service would receive an overpayment resulting from payments from both the patient and the patient's insurance carrier. Petitioner established a separate refund

account at First Interstate Bank (the refund account) to handle the payments refunded to patients. Petitioner would transfer funds from the main account to the refund account and his friend Julie Anne Stanbery (Ms. Stanbery) would then write a check from the refund account to reimburse the patient for the overpayment.

By late 1989, petitioner agreed to pay the hospital up to $1,500 per month for clerical and other services. Petitioner also paid other radiologists for professional services they rendered in the radiology department of the Highline Community Hospital. He treated the radiologists as independent contractors and filed Forms 1099 with the Internal Revenue Service (IRS) to report the payments he made to them. For the taxable years 1990 and 1991, he deducted the payments made to other radiologists as an outside services expense on the Schedules C attached to his income tax returns.

During the taxable years 1990 and 1991, petitioner wrote checks to Ms. Stanbery totaling $49,685 and $45,700, respectively. On the Schedules C attached to his income tax returns for those years, petitioner deducted the amounts paid to Ms. Stanbery as business expenses for outside services. Petitioner, however, did not file a Form W-2 or a Form 1099 for the amount paid to Ms. Stanbery for either year.

Petitioner did not employ a bookkeeper or use a bookkeeping system. Petitioner's accountant has prepared petitioner's tax

returns since the mid-1970's and prepared petitioner's Federal income tax returns and Washington State excise tax returns for 1990, 1991, and 1992. For years prior to 1991, the accountant prepared the returns using the bank statements and canceled checks from petitioner's main bank account. Petitioner also provided the accountant with Forms 1099 petitioner received for interest and dividends. Petitioner wrote checks on the main account for personal as well as business purposes. Using the bank statements and checks, the accountant made assumptions as to which payments were deductible business expenses. Petitioner did not provide the accountant with bank statements and canceled checks from the refund account or the monthly statements from the billing services.

From 1974 until 1989, petitioner paid his former wife child support of $250 per month and alimony of $400 per month. In 1989, petitioner and his former wife agreed that the entire payment of $650 per month would be child support. During 1990, 1991, and 1992, petitioner did not pay alimony to his former wife. The accountant, however, deducted alimony payments on the 1990, 1991, and 1992 returns, because petitioner had taken the deductions in prior years.

In preparing petitioner's 1990 return, the accountant erroneously deducted $263,700 from gross receipts.[2] The accountant reduced petitioner's gross receipts by the amounts transferred from the main account to the refund account. The accountant thought that checks with the notation of "rent" were for petitioner's payment of rent to the hospital. Those rent payments, however, were for petitioner's personal residence. On the Schedule C attached to his 1990 return, petitioner reported gross income of $1,165,076 from his business, computed by reducing gross receipts of $1,194,606 by $29,530 for returns and allowances. On the Schedule C, petitioner reported total business expenses of $521,980 and a net profit of $643,096. On petitioner's 1990 return, in addition to $643,096 of net profit from his practice, petitioner reported $52,810 of interest income, of which $3,695 was from First Interstate Bank, and $5,309 of dividend income.

In computing petitioner's 1991 Washington State excise tax, the accountant did not use petitioner's bank statements, although he had those records. Instead, the accountant estimated petitioner's 1991 State excise tax on the basis of petitioner's 1990 income, taking into account the fact that petitioner

---

[2]The accountant erroneously assumed that interest paid to petitioner by James & Associates had been deposited into the business account. The accountant also made an adjustment of $200,000 but could not recall to what transaction the adjustment related.

effectively stopped practicing as of the end of July 1991. In preparing petitioner's 1991 Federal income tax return, the accountant used the Washington State excise tax amounts to determine gross receipts and petitioner's checks to compute expenses. On the Schedule C attached to his 1991 return, petitioner reported gross receipts of $888,637, no returns or allowances, and $562,348 of total business expenses, resulting in a net profit of $326,289 from his business.

During 1991, petitioner used currency in the following amounts to purchase Krugerrands from Clackamas Gold & Silver, Inc., of Clackamas, Oregon, that were reported to the IRS as cash transactions:

| Date | Total Purchase | Currency |
|------|---------------|----------|
| 3/18/91 | $55,387.50 | $19,887.50 |
| 3/26/91 | 54,900.00 | 19,900.00 |
| 5/31/91 | 74,000.00 | 70,000.00 |

In early 1993, as a result of the reported cash transactions with Clackamas Gold & Silver, the IRS began an audit of petitioner's 1991 return. Petitioner requested that the audit be conducted in his accountant's office in Port Angeles, Washington, where the records were located. In preparation for the audit and to verify the accuracy of the 1991 return, the accountant constructed a spreadsheet for 1991. In preparing the spreadsheet, however, the accountant made errors that resulted in an understatement of gross receipts in excess of almost $500,000.

Because petitioner's 1991 return was under audit, the accountant advised petitioner not to file his 1992 return until the last possible date.  Petitioner filed an application for an automatic extension and filed his 1992 return in August 1993.  In preparing petitioner's 1992 return, the accountant used Forms 1099 and handwritten notes from petitioner to compute petitioner's income; the accountant did not look at petitioner's bank statements and canceled checks.  On the Schedule C attached to petitioner's 1992 return, petitioner reported $15,835 of gross receipts, no refunds, $7,030 total expenses, and net profit of $8,805.  Petitioner did not deduct any amount on the 1992 return for fees paid to the billing services.

In June 1994, the IRS agent referred petitioner's case to the criminal investigation division (CID).  In December 1995, the CID withdrew from the case, because petitioner's accountant accepted responsibility for the omissions and errors in petitioner's returns.

Respondent reconstructed petitioner's income for the taxable years 1990, 1991, and 1992 using the bank deposits method.  The reconstruction report shows deposits of income into four of petitioner's bank accounts (the main account, the refund account, the First Interstate Bank Roseburg account (FIB Roseburg account), and the South Umpqua Bank account (SUB account)),

transfers between petitioner's bank accounts, adjustments, and
unreported gross income for 1990, 1991, and 1992, as follows:

| Bank Account | 1990 | 1991 | 1992 |
|---|---|---|---|
| Main account: | | | |
| Total deposits | $1,470,890.84 | $1,672,099.55 | $52,732.35 |
| Transfers | -0- | (140,000.00) | -0- |
| Refunds | (29,530.00) | -0- | -0 |
| Charge backs | (9,330.37) | -0- | -0 |
| Interest | (2,703.70) | (1,792.00) | (1,647.59) |
| Income | 1,429,326.77 | 1,530,307.55 | 51,084.76 |
| | | | |
| Refund account: | | | |
| Total deposits | $106,527.85 | 49,635.00 | 4,300.00 |
| Transfers | (26,002.00) | (48,995.00) | (3,300.00) |
| Refunds | -0- | -0- | -0- |
| Charge backs | -0- | -0- | -0- |
| Interest | -0- | -0- | -0- |
| Income | 80,525.85 | 640.00 | 1,000.00 |
| | | | |
| FIB Roseburg: | | | |
| Total deposits | -0- | 83,924.26 | 23,157.57 |
| Transfers | -0- | (48,000.00) | (5,000.00) |
| Income | -0- | 35,924.26 | 18,157.57 |
| | | | |
| SUB Roseburg: | | | |
| Total deposits | -0- | -0- | 233,132.41 |
| Transfers | -0- | -0- | (207,877.63) |
| Income | -0- | -0- | 25,254.78 |
| | | | |
| Total income | 1,509,852.62 | 1,566,871.81 | 95,497.11 |
| Reported | | | |
| gross income | (1,165,076.09) | (888,637.00) | (15,835.00) |
| Unreported income | 344,776.53 | 678,234.81 | 79,662.11 |

In the notice of deficiency, respondent determined that
petitioner had unreported income during 1990, 1991, and 1992 as
follows:

| Bank Account | 1990 | 1991 | 1992 |
|---|---|---|---|
| Main account | $263,700 | $630,113 | $35,173 |
| Refund account | 80,525 | 640 | -0- |
| FIB Roseburg | -0- | 35,810 | 18,313 |
| SUB Roseburg | -0- | -0- | 177,726 |
| Total | 344,225 | 666,563 | [1]231,212 |

[1] Respondent conceded before trial that the adjustment for unreported income for 1992 should be $79,662.11, rather than $231,212 as determined in the notice of deficiency.  Respondent made additional concessions on brief regarding 1992, as discussed in the Opinion section, infra.

In the notice of deficiency, respondent disallowed (1) deductions of $5,200 for 1990, 1991, and 1992 that petitioner claimed for alimony payments, (2) deductions of $49,685 for 1990 and $104,690 for 1991 (of which $49,685 in 1990 and $45,700 in 1991 was paid to Ms. Stanbery) that petitioner claimed as outside business expenses for those years, and (3) deductions of $15,600 for 1990 and $10,400 for 1991 that petitioner claimed as business rental expense.  Respondent also disallowed deductions for (1) $29,530 that petitioner claimed for returns and allowances in 1990, (2) $28,038 of business expenses claimed in 1991 that petitioner had previously claimed in 1990, and (3) $11,668 for unsubstantiated business expenses claimed in 1991.

OPINION

Issue I.  Whether Petitioner Failed To Report Gross Receipts of $344,225 for 1990, $666,563 for 1991, and $53,330 for 1992

A taxpayer is required to maintain records sufficient to show whether or not he is liable for Federal income taxes.  Sec. 6001.  Where a taxpayer has failed to maintain adequate records, respondent may reconstruct the taxpayer's income by any reasonable method that clearly reflects income.  Sec. 446; Holland v. United States, 348 U.S. 121, 130-132 (1954).  The bank deposits method has long been approved by the courts as a method

for computing income.  Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Petitioner bears the burden of proving that respondent's determinations, including unreported income, are incorrect.  Rule 142(a); Nicholas v. Commissioner, 70 T.C. 1057, 1064 (1978).

In the notice of deficiency, respondent determined that petitioner failed to report $344,225 of gross receipts from his business practice in 1990, $666,563 in 1991, and $231,212 in 1992.  For the 1990 and 1991 taxable years, petitioner has not contested that the deposits into the accounts were income from his medical practice.  Therefore, we find that petitioner failed to report $344,225 of gross receipts from his business for 1990 and $666,563 for 1991.

For the 1992 taxable year, respondent concedes (1) that petitioner's income for 1992 does not include $177,726 deposited in his SUB account, and (2) that the unreported income from petitioner's deposits in the FIB Roseburg account is $18,157 as set forth in the bank deposits method rather than the $18,313 determined in the notice of deficiency.  On the basis of respondent's concessions and petitioner's failure to show that any of the deposits were not income, we find petitioner failed to report $53,330 of gross receipts in 1992 ($35,173 from the main account and $18,157 from the FIB Roseburg account).

Issue II.  Whether Petitioner Is Entitled to Offsets and Business Deductions in Excess of Those Allowed by Respondent for the 1992 Taxable Year

Respondent acknowledges that the determination for 1992 has not taken into account any offsetting business expenses. Petitioner contends that he is entitled to offsets or deductions totaling $23,349 for (1) amounts refunded to patients, (2) amounts paid to the billing service, (3) State license fee, and (4) miscellaneous expenses charged to his VISA card.

Petitioner has the burden of establishing that he is entitled to such offsets or deductions.  Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  This includes the burden of substantiation.  Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).  A taxpayer must maintain records sufficient to permit verification of income and expenses.  Sec. 6001; sec. 1.6001-1, Income Tax Regs.  That a taxpayer cannot prove the exact amount of an otherwise deductible item, however, is not necessarily fatal.  Unless precluded by section 274, we may estimate the amount of such an expense and allow the deduction for the estimated amount.  Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).  The estimate, however, must have some reasonable evidentiary basis.  Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).

With respect to petitioner's claim that his income should be reduced for amounts he transferred into the refund account, such

transfers are not payments to his patients.  Petitioner has provided no evidence of the amount of payments made from the refund account to his patients.  On the basis of the evidence in the record, we are unable to reasonably estimate the amount of such payments.

Petitioner paid the billing services between 11 and 14 percent of the amounts collected.  During 1992 the billing service collected a total of $70,889 ($52,732 deposited into petitioner's main bank account plus $18,157 deposited into his FIB Roseburg account).  On his 1992 return, petitioner did not deduct any amount for the billing fees he paid.  We will allow petitioner a $7,798 deduction (11 percent of the amounts collected) for billing fees.

On his 1992 return petitioner reported $1,125 for supplies and $1,250 for licenses and taxes.  Petitioner stopped practicing medicine by 1992 and has not shown that the State license fee and miscellaneous expenses exceed the amounts deducted on his 1992 return.

Issue III.  Whether Petitioner Is Entitled to an Embezzlement Loss Deduction for the 1992 Taxable Year

Petitioner concedes the adjustments for alimony, the portion of the adjustment related to payments to Ms. Stanbery,[3] and the adjustments for the rental expenses.

---

[3]Petitioner has made an advance payment of tax for the adjustment related to the payments made to Ms. Stanbery.

For the 1990 taxable year, petitioner has offered no evidence with respect to the expenses disallowed by respondent. Petitioner, however, claims that between $80,000 and $99,000 was embezzled from his accounts. According to petitioner, employees of the billing service and the bank conspired to embezzle the funds. Petitioner asserts that the billing service employee improperly deposited funds collected from his patients to his refund account rather than the main account. The funds were then transferred by a bank employee to petitioner's Columbia Daily Income investment account, and later a check for $99,000 from the investment account was made payable to Clackamas Gold & Silver. Petitioner also asserts that Clackamas Gold & Silver has no record of the transaction.

Ms. Stanbery testified at the trial in this case. No one asked her about these transactions. Petitioner did not call any witnesses from the billing service, the bank, or Clackamas Gold & Silver to testify at the trial in this case.

Section 165 allows a deduction for a theft loss sustained during the taxable year and not compensated for by insurance or otherwise. Sec. 165(a), (c)(3). Section 165(e) provides that the deduction for such a loss is treated as sustained in the taxable year in which the taxpayer discovers the loss. Thus, a loss arising from theft is not deductible in the taxable year in which the theft actually occurs unless that is also the year in

which the taxpayer discovers the loss.  Sec. 1.165-8(a)(2), Income Tax Regs.

Petitioner testified that he did not learn of the loss until bank records for the refund account were obtained by the IRS in the criminal investigation.  The criminal investigation did not begin until June 1994.  We need not decide whether the purported loss occurred, because, for purposes of section 165, the loss, if any, was sustained in 1994, and petitioner is not entitled to a deduction for the loss in the 1990 taxable year.

Issue IV.  Whether Petitioner Is Liable for the Fraud Penalty Under Section 6663 for the 1990, 1991, and 1992 Taxable Years

Respondent determined that petitioner is liable for an addition to tax for fraud under section 6663(a) for each of the years at issue.  Section 6663(a)(1) provides:  "If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud."  Section 6663(b) provides that if the Secretary establishes that any portion of the underpayment is due to fraud, the entire underpayment is treated as fraudulent, except for the portion the taxpayer proves is not attributable to fraud.

Fraud is intentional wrongdoing on the part of the taxpayer with specific intent to avoid tax known to be owing.  Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  The Commissioner must prove fraud by clear and convincing evidence.

Sec. 7454(a); Rule 142(b). Where fraud is determined for more than 1 year, the Commissioner's burden applies individually to each year. Barbuto v. Commissioner, T.C. Memo. 1991-342 (citing Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. per curiam sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958)). To satisfy the burden of proof, the Commissioner must show two things: (1) An underpayment exists, and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).

The first element requires respondent to establish the existence of an underpayment of tax. To prove the underpayment respondent cannot rely solely on petitioner's failure to discharge his burden of proving error in respondent's determination of deficiencies. Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). Respondent may prove an underpayment by proving a likely source of the unreported income, Holland v. United States, 348 U.S. at 137-138, or, where the taxpayer alleges a nontaxable source, by disproving the specific nontaxable source so alleged, United States v. Massei, 355 U.S. 595 (1958).

Through the bank deposits method, respondent has proven petitioner received income from his practice of radiology that he did not report on his Federal income tax returns for each of the years at issue. Additionally, petitioner took deductions for

alimony to his former wife and payments to Ms. Stanbery to which he was not entitled. The underreported income and improper deductions would result in an underpayment of petitioner's taxes for each of the years in issue. Therefore, we find that respondent has satisfied the burden of proof regarding the first element.

The second element requires respondent to prove fraudulent intent on the part of petitioner. Fraud will never be presumed. Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud, however, may be proved by circumstantial evidence, because direct proof of a taxpayer's intent is rarely available. The existence of fraud is a question of fact to be determined on the basis of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).

Courts have developed various factors or "badges" that tend to establish fraud. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Although the list is nonexclusive, some of the factors are: (1) A pattern of understatement of income; (2) inadequate records; (3) concealment of assets; (4) income from illegal activities; (5) attempting to conceal illegal activities; (6) implausible or inconsistent explanations of behavior; (7) dealing in cash; (8) failure to cooperate with the Internal Revenue Service; and (9) failure to file tax returns. Bradford v.

Commissioner, supra at 308; McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

Petitioner acknowledges that he was irresponsible and negligent in the manner in which he handled his business affairs and by his failure to review his returns for the years in issue, but he contends that he did not intend to evade taxes known to be owing. Petitioner contends that the understatement of income for 1990 was caused by a combination of the increase in the volume of procedures petitioner performed at the Highline Community Hospital,[4] the inadequate system previously set in place and used by his accountant, and erroneous assumptions made by the accountant regarding deductions for alimony, payment of rent, and payments to Ms. Stanbery. The understatement of income for 1991 was caused by the accountant's improper use of income reported for the Washington State excise tax, which the accountant had estimated using petitioner's 1990 income and adjusted on the assumption petitioner stopped practicing medicine at the end of July 1991. Although the accountant may have told petitioner that he was estimating the excise tax, there is no evidence that the accountant told petitioner that he had prepared petitioner's Federal income tax returns using the estimated excise tax. The accountant prepared petitioner's 1992 based on Form 1099 and

[4]Petitioner reported taxable income on his returns of approximately $50,000 in 1988, $385,828 in 1989, $701,215 in 1990, and $430,095 in 1991.

petitioner's notes. The accountant had petitioner's bank statements and canceled checks for 1991 and 1992, but he did not bother to use them in preparing petitioner's returns for those years.

Petitioner admits that his bookkeeping was "abhorrent". The method petitioner used, however, was established by his accountant and used by the accountant for many years. The accountant used petitioner's main bank statements and canceled checks to prepare petitioner's returns. Petitioner provided those records to the IRS during the audit of his return. Although the billing services provided petitioner with monthly statements of his patients' receivables and collections, petitioner did not keep those records. Respondent has not proven, however, that petitioner destroyed or otherwise failed to maintain those records in order to evade tax.

Petitioner purchased gold Krugerrands with substantial amounts of cash during 1991. The IRS agent testified that he assumed the cash came from petitioner's safe-deposit box. Although the IRS agent never determined where the cash came from, the notice of deficiency did not include an increase in petitioner's 1991 income attributable to the cash payments for the gold. There is no evidence that any of petitioner's patients paid in cash. Petitioner's fees were collected by his billing service, and payments were deposited into petitioner's checking account.

Based on all the evidence, we find that respondent has failed to prove by clear and convincing evidence that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. We hold that petitioner is not liable for the fraud penalty under section 6663(a) for any of the years at issue.

Issue V.  Whether the Assessment and Collection of a Deficiency for the 1990 Taxable Year Is Barred by the Statute of Limitations

Petitioner asserts that the 3-year period of limitations bars respondent's assessment of the deficiency for the 1990 taxable year.  Respondent contends that petitioner filed a false or fraudulent return for the 1990 year, and therefore, under section 6501(c)(1), the tax may be assessed at any time.  Since we have found no fraud, the section 6501(c)(1) exception to the 3-year period of limitations does not apply.

Respondent alternatively contends that section 6501(e)(1)(A) applies to extend the limitations period for the 1990 taxable year to 6 years.  Petitioner concedes that the notice of deficiency was issued within the 6-year period.

Section 6501(e)(1)(A) provides that "If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed * * * at any time within 6 years after the return was filed."  For purposes of the 6-year limitations period, in the case of a trade or business, the term

"gross income" means the total of the amounts received from the sale of services prior to diminution by the cost of such services.  Sec. 6501(e)(1)(A)(i).

For the 1990 taxable year, petitioner reported gross receipts of $1,194,606 from his practice, plus $52,810 of interest income and $5,309 of dividend income.  Thus, for purposes of section 6501(e)(1), petitioner reported $1,252,725 of gross income on his 1990 return.  Twenty-five percent of that amount is $313,181.25.  Petitioner failed to report $344,225 of gross receipts from his practice, which is in excess of 25 percent of the gross income reported on the return.  If petitioner had suffered an embezzlement loss, the loss would not reduce his gross income for purposes of the 6-year limitations period.  Sec. 6501(e)(1)(A)(i).  Therefore, the 6-year period of limitations under section 6501(e)(1) applies, and respondent is not barred from assessing or collecting the deficiency in tax for the 1990 taxable year.

Issue VI.  Whether Petitioner Is Liable for the Accuracy-Related Penalty Under Section 6662(a) for the 1990, 1991, and 1992 Taxable Years

In the notice of deficiency respondent determined that, if the fraud penalty does not apply, petitioner is liable for the accuracy-related penalty under section 6662(a) for negligence or substantial understatement of tax for each of the years in issue. Petitioner admitted that he was negligent for the years at issue

Accordingly, respondent's determination is sustained for each of the taxable years at issue.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.